**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| TAWA PLC, QX REINSURANCE COMPANY LIMITED and PRO IS, INC., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

**COMPLAINT**

Plaintiffs, TAWA PLC ("Tawa"), QX REINSURANCE COMPANY LIMITED ("QX") and PRO IS, INC. ("PRO") (collectively, the "Tawa Group"), by their undersigned attorneys, bring this Complaint against Defendant, PENNSYLVANIA NATIONAL MUTUAL INSURANCE COMPANY ("Penn National"), and allege the following:

**PARTIES**

1.      Plaintiff Tawa is a public limited company organized and existing under the laws of England with its principal place of business in England.

2.      Plaintiff QX is a special purpose reinsurer organized and existing under the laws of Bermuda with its principal place of business in Bermuda.

3.      Plaintiff PRO is a corporation organized under the laws of Delaware with its principal place of business in New York.

4.      Defendant Penn National is a mutual insurance company organized and existing under the laws of Pennsylvania with its principal place of business in Pennsylvania.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1)–(2) based on diversity of citizenship between Plaintiffs and Defendant, and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      Further, this Court has jurisdiction over the parties and the subject matter of this action under Section 7.7(b) of the Master Transaction Agreement among Penn National, Tawa, QX and PRO executed on or about March 31, 2011 (the "MTA").  Under Section 7.7(b) of the MTA, each of the parties "irrevocably and unconditionally submit[ted] to the exclusive jurisdiction of any state or federal court located in the State of Delaware, over any action, suit or proceeding arising out of or relating to [the MTA] or the transactions contemplated [thereby]" and "irrevocably and unconditionally waive[d] any objection to the laying of venue of any such action, suit, or proceeding brought in any such court and any claim that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum."

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(c) because Penn National is subject to personal jurisdiction in this judicial district and because there is no district in which the action may otherwise be brought.  Penn National is subject to personal jurisdiction in this judicial district based on Section 7.7(b) of the MTA, wherein Penn National, for purposes of any action such as this one arising out of or relating to the MTA, irrevocably and unconditionally submitted to the exclusive jurisdiction of this Court.

## FACTS

*The Proposal to Reinsure*

8.      In October 2010, Penn National invited Tawa to provide a quote to reinsure certain risks associated with Penn National's landlord liability insurance program.  Penn

National was looking to reinsure lead paint risks it insured primarily between 1991 and 1997 for residential properties located in and around Baltimore, Maryland.  The proposed transaction was referred to as "Project Pocono."

9.     Penn National engaged and paid Lexicon Partners (US) LLC ("Lexicon"), a corporate financial advisory and investment banking firm, to serve as its agent in negotiating the proposed reinsurance and related transactions with Tawa.

10.    The proposed reinsurance was to cover all liability claims arising under the relevant Penn National policies that involved the alleged mental impairment of tenant children who had ingested lead paint while residing at the insured properties.  Because Penn National's landlord liability policies incepting on or after August 1, 1997 excluded coverage for losses associated with lead paint exposure, and because under Maryland law a claimant must be under age 21 (*i.e.,* within three years of the age of majority) to have an actionable personal injury claim, the risk of new claims was expected to end in the year 2018.

11.    In order to provide Penn National the requested quote and, more generally, in order to decide whether and at what price to accept the risk it was being asked to reinsure, the Tawa Group attempted to calculate an adequate reserve for the amounts Penn National would have to pay out in the future on the insurance policies it had issued.  This involved assessing the potential liability of Penn National not only with respect to claims that had already been reported, but also with respect to claims that would be reported in the future.  In other words, in order to calculate an adequate reinsurance premium, the Tawa Group needed to have a reliable estimate of the number of future claims and the amount of future claim payments and expenses as of the date of the transaction.

12.     Toward that end, beginning in the fall of 2010, the Tawa Group undertook an extensive due diligence process that necessarily required Penn National's assistance and cooperation because Penn National possessed or had sole access to the data and other information material to the risk proposed to be reinsured.  As the Tawa Group and Penn National both agreed and understood, the due diligence phase—*i.e.*, the period during which the Tawa Group's actuaries were reviewing and investigating the business proposed to be reinsured— ended several weeks before the transaction closed.

13.     In connection with the Tawa Group's due diligence effort, Penn National, either directly or through its agent Lexicon, furnished the Tawa Group data, actuarial reports and other information purportedly bearing on that risk.

14.     Penn National and Lexicon mainly furnished the Tawa Group information relating to Penn National's historic claims experience, including statistics purportedly showing the number of and the amounts expended on lead paint claims made each year between 2006 and 2010.  This information included an internal Penn National actuarial analysis suggesting that, as of December 31, 2009, a $28,101,000 total claims reserve (net of reinsurance recoveries) would be adequate to cover all past and future lead paint claims under the landlord liability program.  Although Penn National updated its actuarial analysis just as the Tawa Group was conducting its due diligence, Penn National refused to provide its updated report to the Tawa Group.

15.     Using the information Penn National and Lexicon provided and the same model Penn National had used to estimate reserves through December 31, 2010, the Tawa Group attempted to estimate on its own an adequate claim reserve as of December 31, 2009, and then supplemented its estimate using aggregate data through December 31, 2010.  The Tawa Group reviewed each claim separately and projected expected minimum reserves based on several key

factors:  reporting age of the claimant; expected claim size in the event of a successful claim; expected allocated loss adjustment expenses ("ALAE") for each successful claim; expected ALAE for each unsuccessful claim; and the probability of claim success.  The Tawa Group also considered the distribution by age of annual new claims and the anticipated tail-off of new claims given the gradual removal of exposure over time.

16.     The Tawa Group's analysis enabled it to project claim and ALAE reserves on known claims, as well as the frequency and severity of claims to be reported in the future.  By developing a payment pattern for known claims, the Tawa Group was able to project an overall future run-off pattern and compare the projected payments for 2010 with the actual payments made that year.

17.     As it was considering the most or more likely future claim scenarios, the Tawa Group also took into account a range of possible outcomes, including bad or worst case scenarios, and attempted to calculate how likely (or unlikely) such outcomes might be.  The Tawa Group undertook its various analyses in order to better understand the magnitude of the risk it was being asked to reinsure and the level of uncertainty attendant to the transaction.

18.     In reliance upon the information Penn National and Lexicon had provided, the Tawa Group ultimately arrived at an estimated claim reserve figure (net of reinsurance recoveries) of $39,920,000 as of December 31, 2010.  The Tawa Group intended to consider this figure, among other factors, when calculating the reinsurance premium it would charge Penn National.

19.     In reliance upon the information Penn National and Lexicon had provided, the Tawa Group considered its estimated claim reserve figure, which the Tawa Group used to calculate the reinsurance premium, to be conservative, and the Tawa Group recognized that the

reserve actually required could end up being substantially lower. The Tawa Group also recognized that if its model were adjusted to allow for the number of actual claims made in 2010, which was slightly higher than the number the Tawa Group had projected, then an additional $2 million to $3 million would need to be added to the estimated reserve and the reinsurance premium ultimately calculated would have to be adjusted upward.

20. The Tawa Group and its lender next engaged the actuarial and consulting firm of Milliman, Inc. ("Milliman") to review the Tawa Group's in-house projections and to provide independent reserve estimates as of December 31, 2010. The Tawa Group intended to factor in Milliman's reserve estimates and recommendations when pricing the transaction.

21. Milliman premised its projections of Penn National's future liabilities on the following six types of data:

a. raw data provided by the Tawa Group that indicated the number of lead paint claims per year, the paid loss and ALAE amounts for each claim, case reserves, reporting date and policy year effective dates;

b. a claimant database indicating the age of each claimant and the policy limits of each affected policy;

c. the Tawa Group's in-house actuarial report dated February 15, 2011;

d. a Tawa Group summary and review of the process then in place at Penn National to manage lead paint claims;

e. a reinsurance report summarizing the reinsurance then in place for Penn National, organized by policy period; and

f. a list of adjustments needed to update the loss values contained in the claimant database.

22. As a result of its analysis, Milliman estimated Penn National's unpaid claim liability (net of reinsurance recoveries) as of December 31, 2010, to be $43,400,000. Milliman

attributed the difference between the Tawa Group's reserve estimate and its own reserve estimate to, among other things, the fact that Milliman had been provided more recent claims data.

23.     In its written report, issued on March 22, 2011, Milliman noted that it was difficult to test the reasonableness of the Tawa Group's projected claims expectations because, among other reasons, such basic information as the number of insured units or the number of tenants potentially exposed to lead paint during their occupancy of the insured properties was reportedly unavailable.

24.     During the due diligence phase, the Tawa Group not only sought information on Penn National's past claim experience, but also information reflecting potential future exposure, which would assist the Tawa Group in assessing the scope of the risk it was being asked to reinsure.  For example, on November 5, 2010, as part of the Tawa Group's due diligence effort, the Tawa Group's internal actuaries spoke by telephone with Penn National's internal actuaries. This was the one and only opportunity the Tawa Group's actuaries (internal or external) were given to speak with Penn National's actuaries (internal or external).

25.     During that telephone conversation, a Tawa actuary specifically asked Penn National for any and all exposure information, *i.e.,* information that would assist the Tawa Group in evaluating the scope of the risk and the potential exposure under the relevant policies.  Penn National responded that no such information was available.

26.      In addition, on January 13, 2011, the Tawa Group asked Lexicon for "[a] full list of Policies to be included in the transaction showing Policy, Insured, *and Scheduled Units*." (Emphasis added.)   By this request, the Tawa Group was obviously seeking information reflecting the number of insured properties involved and the number of units within each of those insured properties so that it could assess how many potential claimants there might be.

27.     Penn National did not provide the requested information, and, worse, intentionally misled the Tawa Group into believing such information did not exist.

28.     Although Lexicon offered to go through the original policy materials it did have and create a (partial) list of the properties Penn National knew to be covered, it cautioned that this would be a "relatively intense process" that would take a few days.  Accordingly, Lexicon stated that it would prefer to do that after "heads of terms," *i.e.*, an agreement in principle, were signed.  Tawa agreed.

*The Master Transaction Agreement*

29.     On March 31, 2011, Penn National, Tawa, QX and PRO entered into the MTA and four "Ancillary Agreements":  (1) a Reinsurance Agreement between Penn National and QX, the Bermudian-regulated, special purpose reinsurance company created to provide reinsurance for Penn National's book of lead paint exposures; (2) a Trust Agreement between QX (as Grantor), Penn National (as Beneficiary) and State Street Bank and Trust Company (as Trustee) under which QX was to establish a grantor trust to secure its obligations to Penn National under the Reinsurance Agreement; (3) an Administrative Services Agreement between Penn National and PRO under which PRO was to provide all claims and reinsurance administration and related reporting services to Penn National necessary to administer the program and applicable third-party reinsurance agreements; and (4) a Guaranty Agreement under which Tawa was to guarantee in favor of Penn National the timely performance and payment of QX's obligations to Penn National under the Reinsurance Agreement.  Copies of the MTA and the Ancillary Agreements are attached to this Complaint as Exhibits 1 through 5.

30.     Under the MTA and the various Ancillary Agreements, Penn National (referred to in the MTA and certain of the Ancillary Agreements as the "Cedent") agreed to cede to QX

(referred to in the MTA and certain of the Ancillary Agreements as the "Reinsurer") certain liabilities associated with its lead paint business in and around Baltimore, and QX agreed to reinsure Penn National for such liabilities up to an aggregate limit of $100,000,000 (less certain amounts).

31.     Under the MTA, Penn National agreed to pay into the trust account established by the Trust Agreement a "Reinsurance Premium" totaling $58,975,000, and QX agreed to pay into that trust account an "Additional Security Amount" of $34,726,000.   These amounts were to serve as collateral for QX's obligations to Penn National under the Reinsurance Agreement.

32.     Under the MTA, Penn National also agreed to pay PRO an "Expense Premium" as compensation for the services PRO was to perform under the Administrative Services Agreement.   As set forth in the Administrative Services Agreement, the Expense Premium totaled $4,173,767 and was to be paid in scheduled quarterly installments between the Closing Date and October 1, 2020.

33.     Under Section 2.3(c) of the MTA, Penn National had an obligation to deliver to QX, or to PRO at QX's direction, at or prior to the Closing, all Books and Records (other than closed claim files, which were to be delivered not later than thirty days after the Closing).

34.     The MTA defines "Books and Records" to mean the following:

> originals or copies of all of the following material, known records in the possession or control of a Party or its Affiliates and relating to the Subject Business:  (a) claims records (including with respect to closed claims), policy forms, policy information, policyholder information, sales records, underwriting records, claims handling and reserving manuals, compliance records and filings expressly related to the Subject Business required under Applicable Law, and (b) Covered Contracts; provided, however, and for the avoidance of doubt, that Books and Records excludes (1) Tax Returns and Tax records and all other data and information with respect to Tax (other than with respect to Transfer Taxes, premium taxes, Federal Excise Taxes or similar Taxes), (ii) any files, records, data and

information not reasonably related to a party's administration of the Subject Business, including the monitoring and auditing of such party's performance in administering the Subject Business and any internal reports related to such monitoring and auditing; (iii) any materials prepared for the boards of directors of Cedent or its Affiliates, or Reinsurer or its Affiliates (provided that no records of the Cedent that would ordinarily be maintained as part of claims files are being excluded solely by virtue of having been presented to such boards), (iv) any materials that are privileged and/or subject to a written agreement of confidentiality prohibiting disclosure for which Cedent or its Affiliates do not have a common interest with Reinsurer, (v) regulatory filings made by Cedent and any related correspondence with Governmental Authorities not expressly related to the Subject Business, and (vi) any actuarial studies or reports related to the Subject Business; provided, further, that if any such records or data referred to in the foregoing clauses (a) and (b) contain information which does not relate to the Subject Business, such information shall not constitute "Books and Records" for purposes of this Agreement.

35.     The MTA defines "Subject Business" to mean "the business of insuring, reinsuring and administering, as applicable, and the rights, liabilities and obligations arising out of or relating to the Covered Contracts and the Third Party Reinsurance Agreements."

36.     The MTA defines "Covered Contracts" to mean, with respect to the Subject Rental Property Contracts, "only those portions thereof that provide coverage for lead-based paint exposure."

37.     The MTA defines "Subject Rental Property Contracts" to mean, subject to certain exceptions and clarifications:

only the written policies, certificates, binders, slips, agreements or undertakings to insure, and all riders, endorsements and amendments thereto, issued directly by Cedent prior to December 31, 1997 that provide coverage to the landlords listed on Schedule 1.1(a) of the Cedent Disclosure Schedule in respect of habitational rental property in the City of Baltimore or the County of Baltimore, Maryland.

38.    The MTA defines "Third Party Reinsurance Agreements" to mean "any reinsurance agreements, cover slips or binders relating to the Covered Contracts or Cedent's liabilities thereunder, but only to the extent such reinsurance agreements, treaties, cover slips or binders relate to lead paint exposure insured under the Covered Contracts. . . ."

39.    Article III of the MTA sets forth various representations and warranties of Penn National (as Cedent).  Section 3.8(a) provides as follows:

> Set forth on Schedule 3.8(a) of the Cedent Disclosure Schedule are true and correct copies of all documents, data and other information delivered to Parent [*i.e.,* Tawa] or its Affiliates prior to the date of this Agreement in connection with Parent's and its Affiliates' review and investigation of the Subject Business, excluding all documents, data and information made available to Parent and its Affiliates by access to Cedent's computer system from December 15, 2010 to on or about March 14, 2011 (the "**Electronic Access Data**," and, together with the documents, data and information on Schedule 3.8(a), the "**Review Data**").  For the avoidance of doubt and without limiting the generality of this Section 3.8(a), Cedent is not aware of the particular documents, data or information reviewed by Parent or its Affiliates as part of the Electronic Access Data.  To the Knowledge of Cedent, Cedent's delivery or provision of access to Parent or its Affiliates of the Review Data represents complete disclosure of all data and information material to the losses being reinsured under the Reinsurance Agreement, except as and to the extent excluded from Books and Records.  To the Knowledge of Cedent, the Review Data, as amended (except with respect to Electronic Access Data), provided to Parent or its Affiliates is true, correct and complete in all material respects.

40.    Under this provision, Penn National warranted and represented that "to the Knowledge of Cedent," Penn National had, prior to the date of the MTA in connection with the Tawa Group's review and investigation of the Subject Business, fully disclosed as part of the Electronic Access Data or other Review Data "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

41.     Section 3.8(b) provides as follows:

> Without limiting the generality of the foregoing, the claims register included in the Review Data constitutes, to the Knowledge of Cedent, a true, correct and complete listing of all claims made under the Covered Contracts as of the date thereof.  Set forth on Schedule 3.8(b) of the Cedent Disclosure Schedule is a current claims register which, to the Knowledge of Cedent, constitutes a true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date.

42.     Under this provision, Penn National warranted and represented that "to the Knowledge of Cedent," Penn National had provided the Tawa Group upon Closing a claims register containing a "true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date."

43.     Section 3.8(c) provides as follows:

> The claims files of Cedent made available to Parent [*i.e.*, Tawa] and its Affiliates during the period from December 15, 2010 to on or about March 14, 2011, to the Knowledge of Cedent at the time such files were made available (i) constituted all of the claims handling, claims processing, claims payment or other files and records maintained by or available to Cedent relating to the receipt and administration of claims in respect of the Covered Contacts, (ii) were true, correct and complete in all material respects, and (iii) fully reflected all material claims data and information in Cedent's possession with respect to claims made under the Covered Contracts. . . .

44.     Under this provision, Penn National warranted and represented that "to the Knowledge of Cedent," Penn National had made available to the Tawa Group between December 15, 2010 and on or about March 14, 2011 *all* of the claims handling, claims processing, claims payment or other files and records maintained by or available to Penn National relating to the receipt and administration of claims in respect of the Covered Contacts and that "to the Knowledge of Cedent," such files and records "fully reflected all material claims

data and information in Cedent's possession with respect to claims made under the Covered

Contracts."

45.     The MTA defines the term "Knowledge," with respect to the Cedent, as "the

actual knowledge, after reasonable inquiry and investigation, of those individuals listed on

Schedule 1.1(b) of the Cedent Disclosure Schedule.   Schedule 1.1(b) of the Cedent Disclosure

Schedule lists the following individuals:

> Frank Benedek, VP Claims
> Tom Kline, Director, Technical Operations
> Sharon Lane, VP, Commercial Lines
> Alan McCormick, Liability Examiner
> Brent Reifsnyder, Director, Administrative Services
> Karen Yarrish, Senior Vice President, Secretary & General Counsel

46.     Section 3.14 of the MTA provides as follows:

> Notwithstanding anything contained in this Agreement or any
> Ancillary Agreement to the contrary, (a) neither the Cedent nor
> any Person on behalf of Cedent is making any representations or
> warranties whatsoever, express or implied, beyond those expressly
> made by it in this ARTICLE III and in the Trust Agreement, and
> (b) reinsurer, PRO, Parent and their respective Affiliates have not
> been induced by, or relied upon, any representations, warranties or
> statements (written or oral), whether express or implied, made by
> any Person, that are not expressly set forth in this ARTICLE III or
> in the Trust Agreement. . . .

47.     Section 4.12 of the MTA provides as follows:

> Reinsurer, PRO, Parent and their Affiliates have such knowledge
> and experience in financial, business, insurance and reinsurance
> matters that they are capable of evaluating the merits and risks of
> the transactions contemplated by this Agreement and the Ancillary
> Agreements.  Reinsurer, PRO and Parent have conducted their own
> independent review and analysis of the Subject Business and
> acknowledge and agree that Cedent has provided Reinsurer, PRO
> and Parent with access to the personnel and Review Data relating
> to the Subject Business for this purpose.   In entering into this
> Agreement, Reinsurer, PRO and Parent acknowledge and agree in
> respect of the transactions contemplated under this Agreement and
> the Ancillary Agreements (a) that, except for the representations

and warranties contained in <u>ARTICLE III</u> of this Agreement, none of Cedent, its Affiliates or its respective Representatives makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information (including any projections, estimates or other forward looking information) provided (including in any management presentations, information memorandum, ratings agency presentations, supplemental information or other materials or information with respect to any of the above) or otherwise made available to Reinsurer, PRO, Parent or their respective Affiliates or Representatives and (b) that subject to <u>ARTICLE VI</u> hereof, to the fullest extent permitted by Applicable Law, Cedent, its Affiliates and its respective Representatives shall not have any liability or responsibility whatsoever to Reinsurer, PRO or Parent or their respective Affiliates or Representatives on any basis (including in contract or tort or otherwise) based upon any information provided or made available, or statements made (or omissions therefrom), in each case prior to the Closing, to Reinsurer, PRO or Parent or their respective Affiliates or Representatives, except as and only to the extent expressly set forth herein with respect to the express representations and warranties contained in <u>ARTICLE III</u> of this Agreement.

48.     Under Section 6.1 of the MTA, Penn National agreed to indemnify QX and PRO and their respective directors, officers, employees and Affiliates (the "Reinsurer Indemnitees") from any and all Loss to the extent resulting from, among other things, "any breach or inaccuracy of any representation or warranty contained in <u>ARTICLE III</u> of this Agreement."

49.     Under the MTA, "Loss" means "losses, costs, obligations, liabilities, penalties, settlement payments, damages (including indirect, incidental and lost profits as direct damages, but excluding punitive damages) and reasonable out-of-pocket expenses (including reasonable attorney's fees)."

50.     Section 6.4(d) of the MTA provides as follows:

Cedent shall have no obligation to indemnify the Reinsurer Indemnitees under Section 6.1(a) for breaches or inaccuracies or any representation or warranty made by Cedent under <u>ARTICLE III</u> until Losses arising from such breaches or inaccuracies that would otherwise be indemnifiable hereunder incurred by such

Reinsurer Indemnitees exceed twenty-five thousand dollars ($25,000) in the aggregate (the "**Indemnity Threshold**"), and thereafter Cedent shall be responsible only for the excess of such aggregate over the Indemnity Threshold; provided, however, that in no event shall the aggregate of all indemnifiable claims paid by Cedent to the Reinsurer Indemnitees under Section 6.1(a) exceed eight million dollars ($8,000,000) in the aggregate (the "**Indemnity Cap**"). . . .

51.     Section 6.4(i) of the MTA reads as follows:  "Nothing contained in this ARTICLE VI will limit in any way any remedies available to any Party or its Affiliates in respect of fraud or willful misconduct in connection with the transactions contemplated hereby."

52.     Section 6.5 of the MTA provides as follows:

From and after the Closing, this ARTICLE VI sets forth the sole and exclusive remedy for any breach, inaccuracy, violation or nonfulfillment of this Agreement (including any representation, warranty, covenant, obligation, or other agreement or condition contained in this Agreement), regardless of whether a claim or counterclaim is based in tort, contract or any other legal theory, or arises under Applicable Law or in equity, except that the remedies of injunction and specific performance to the extent available under Section 7.11 of this Agreement shall remain available to the Parties.   In furtherance of the foregoing, each Party hereby irrevocably waives, from and after the Closing, to the fullest extent permitted under Applicable Law, any and all rights, claims, counterclaims and causes of action (other than claims or counterclaims of, or causes of action arising from, fraud) it may have against the other Party arising under or based upon this Agreement, any Applicable Law, common law or otherwise, except (a) pursuant to the indemnification provisions set forth in this ARTICLE VI, (b) the remedies of injunction and specific performance to the extent available under Section 7.11 of this Agreement, and (c) the foregoing shall not be construed to in any case limit or waive the rights and remedies available to any Party or its Affiliates pursuant to the Ancillary Agreements.

53.     Section 7.7(a) of the MTA, which addresses Governing Law and Jurisdiction, reads (in all capital letters) as follows:

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE

STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OR CHOICE OF LAW OF THAT OR ANY OTHER JURISDICTION THAT COULD COMPEL THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

54.     Section 7.14 of the MTA provides as follows:

Without limiting any remedies available with respect to fraud or willful misconduct, in consideration of the covenants and agreements contained herein, each Party does hereby agree that this Agreement, and each and every provision hereof, is and shall be enforceable by and between them according to its terms, and each Party does hereby agree that it shall not contest in any respect the validity or enforceability hereof.

55.     The various transactions contemplated by the MTA and the Ancillary Agreements closed, and the MTA and the Ancillary Agreements took effect, on March 31, 2011.

*The Dackman Tenant List*

56.     In or about December 2010, unbeknownst to the Tawa Group and while the Tawa Group was conducting its due diligence and seeking detailed information on the book of business proposed to be reinsured, Penn National retained the law firm of Saul Ewing, LLC ("Saul Ewing") to compile a list of the tenants who over the decades applied to reside in the properties owned by one of the insured landlords, Elliott Dackman.  Toward that end, a team of lawyers from Saul Ewing interviewed Mr. Dackman and reviewed and analyzed his tenant rental applications and other records.

57.     Saul Ewing compiled the results of its survey into a lengthy spreadsheet (the "Dackman Tenant List").

58.     The Dackman Tenant List not only lists by street address the properties owned by Mr. Dackman covered under Penn National's landlord liability policies, it also provides the names and birthdates of the persons who applied to reside in those properties during the relevant

period.  Although a law firm compiled it, the Dackman Tenant List includes no legal analysis or advice and bears no notation that its contents are privileged.

59.     The Dackman Tenant List includes information pertinent to lead paint claims made both before and after the Closing.  The Dackman Tenant List therefore constitutes a file or record maintained by or available to Penn National relating to the receipt of claims with respect to the Covered Contracts and material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.  The Dackman Tenant List also constitutes data and information material to the losses being reinsured under the Reinsurance Agreement.

60.     Penn National received the Dackman Tenant List in or about December 2010, that is, during the due diligence phase and about three months prior to the Closing of the MTA on March 31, 2011.  At the time, Karen Yarrish, Penn National's Senior Vice President, Secretary & General Counsel, was aware of Saul Ewing's survey and the Dackman Tenant List.  Indeed, the entire project was coordinated by Penn National's Legal Department, which Ms. Yarrish headed.

61.     Notwithstanding the Tawa Group's request for exposure information, Penn National decided not to disclose the existence of the Dackman Tenant List to the Tawa Group during its review and investigation of the Subject Business.  Nor did Penn National disclose the existence of the Dackman Tenant List in response to the Tawa Group's January 13, 2011 request for "A full list of Policies to be included in the transaction showing Policy, Insured and Scheduled Units."  At the time, Penn National was in possession of the Dackman Tenant List, which reflected not only the number of Dackman-owned units but also the number of and ages of the children who may have resided in the units over the relevant period.  This information was

material to the Tawa Group as it was considering whether and on what terms to reinsure the subject lead paint risks, but Penn National, aware of this, nevertheless intentionally concealed it.

62.     On March 22, 2011, nine days before the Closing, Penn National's outside counsel sent to the Tawa Group's counsel drafts of various schedules to the MTA, including a draft of Schedule 3.8(b), the claims register, the final version of which would be subject to representations and warranties by Penn National.  Upon receiving that draft of Schedule 3.8(b), Tawa circulated it internally and among the Tawa Group to determine whether its contents warranted further review or changed the Tawa Group's assessment of the book of business proposed to be reinsured.

63.     On March 28, 2011, three days before the Closing, Penn National's outside counsel sent to the Tawa Group's counsel drafts of several additional MTA schedules, including drafts that, when submitted in final form, would be subject to representations and warranties by Penn National.  Upon receiving those drafts, Tawa circulated them internally and among the Tawa Group to determine whether they raised any issues that might require last-minute negotiation.

64.     Also on March 28, 2011, Ms. Yarrish sent by overnight mail to the Tawa Group's outside counsel—not to the Tawa Group's actuaries who had performed the due diligence and completed it several weeks earlier—six CDs purporting to contain the set of materials constituting the Books and Records, which materials were not the subject of any representations or warranties.  Upon information and belief, at the time she sent the package, Mr. Yarrish knew that the Tawa Group's actuaries performed its due diligence and that its outside counsel had no role in due diligence. The set of materials was voluminous and included policy files, specimen policy forms, miscellaneous claims information, miscellaneous underwriting information, third-

party Reinsurance Agreements, and numerous other items.  Buried among those materials, specifically within the miscellaneous claims information, was the Dackman Tenant List.  This was the first time Penn National ever mentioned or gave the Dackman Tenant List to the Tawa Group, as Penn National had failed to mention or give the Dackman Tenant List to any member of the Tawa Group during the due diligence phase, *i.e.*, as it was reviewing and investigating the Subject Business.

65.     On March 30, 2011, one day before the Closing, Penn National's outside counsel sent to the Tawa Group's counsel the Review Data subject to the representations and warranties set forth in Section 3.8(a) of the MTA.  Tawa immediately circulated the Review Data internally and among the Tawa Group to ensure that Penn National had provided all of it during the due diligence phase.  The Dackman Tenant List was not part of the Review Data sent on March 30, 2011.

66.     When the MTA took effect on March 31, 2011, Ms. Yarrish knew that Penn National had not disclosed the Dackman Tenant List to the Tawa Group when it was conducting its review and investigation of the Subject Business.  Specifically, Ms. Yarrish knew that the Dackman Tenant List was not included on Schedule 3.8(a) of the Cedent Disclosure Schedule to the MTA, which reflected all of the Review Data that Penn National had delivered to Tawa or its Affiliates prior to the date of the MTA in connection with their due diligence review.  Under Section 3.8(a) of the MTA, the Dackman Tenant List should have been included in the Review Data because it contained "data and information material to the losses being reinsured under the Reinsurance Agreement and the Third Party Reinsurance Agreements" and because it did not fall into any exclusion from Books and Records.

67.     The materiality of the Dackman Tenant List to the Tawa Group's decision to pursue the transaction on the agreed terms is beyond cavil.  The information and data Penn National provided to the Tawa Group during the due diligence process related almost exclusively to Penn National's past claims experience and reinsurance arrangements.  Penn National did not disclose to the Tawa Group, as it was conducting its due diligence, any data—such as that appearing in the Dackman Tenant List—reflecting the number of insured units or the number or ages of the individuals that may have been exposed as children to lead paint at the insured properties.  Indeed, during the due diligence phase, Penn National falsely denied that any such data existed.

68.     The Tawa Group's internal and external actuaries were stunned when they saw the Dackman Tenant List in 2012 because they have never come across a similar data collection in any transaction before or since the Penn National transaction.

69.     Although during due diligence the Tawa Group asked for information bearing on the potential exposure, Penn National falsely responded that such information was not available. The Tawa Group did not know at the time that Penn National had commissioned a law firm to compile an extensive list of precisely the sort of exposure information the Tawa Group had asked to see but was told did not exist.  Knowing that information would likely scuttle the transaction, Penn National intentionally concealed it.  Nor has Penn National ever provided the Tawa Group with any of Penn National's internal communications or external communications with Saul Ewing or others about the Dackman Tenant List.

70.     The Dackman Tenant List would have been extremely beneficial to the Tawa Group's underwriting of the transaction, as it would have enabled the Tawa Group to better understand and include in its calculations the universe of potential claimants and to better

appreciate the level of uncertainty attendant to the transaction. Indeed, had Penn National disclosed the Dackman Tenant List during the due diligence phase, the Tawa Group would have recognized the sharply higher magnitude of the risk and either charged a drastically higher reinsurance premium that would have been unacceptable to Penn National or abandoned the transaction altogether.

*The Claims Register*

71.     On March 31, 2011, in connection with the Closing, Penn National furnished the Tawa Group with Schedule 3.8(b) of the Cedent Disclosure Schedule. And, when it entered into the MTA, Penn National represented and warranted that Schedule 3.8(b) contained "a current claims register which, to the Knowledge of Cedent, constitute[d] a true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date."

72.     At the time of the Closing, the Tawa Group relied on this representation and warranty and had no reason to question the completeness or accuracy of the claims register. After the Closing, however, the Tawa Group came to learn that the claims register was neither complete nor accurate.

73.     Specifically, during the transition of the claims-handling function from Penn National to PRO, PRO attempted to reconcile the information on the claims register with the information on Penn National's internal claims database, which Penn National made available to PRO after the Closing. PRO found that the claims register and the Penn National claims database could not be reconciled because the database included a substantial number of lead paint claims that were omitted from the claims register. The database also showed that the claims register understated by at least 10% the amount Penn National had paid out in claims over the years.

74.     Because of the significant omissions from and inaccuracies in the claims register, PRO incurred unexpected costs in reconciling the claims information Penn National had disclosed in the claims register with the claims information contained in Penn National's internal claims database, and in coming up with definitive claim numbers and payment figures.

75.     Furthermore, because Penn National's claim register significantly understated the number of claims Penn National had experienced over the years, Tawa and PRO significantly underestimated the number of personnel PRO would require in order to handle the volume of claims to be made under the Reinsurance Agreement.  If Penn National had provided a complete and accurate claims register, then Tawa and PRO would have anticipated a much larger volume of claims.  In that event, the Tawa Group would have required Penn National to pay at least $1.2 million as additional consideration for the work to be performed by PRO in adjusting reinsurance claims under the Administrative Services Agreement.   Alternatively, if Penn National had provided a complete and accurate claims register, then Tawa and PRO would have anticipated a much larger volume of claims and would not have agreed to administer the program and applicable third-party reinsurance agreements for a fixed Expense Premium.

76.     By furnishing an incomplete and inaccurate claims register to the Tawa Group upon Closing, Penn National breached the express warranty and misrepresented the facts set forth in Section 3.8(b) of the MTA.  Contrary to Penn National's warranty and representation, the claims register contained in Schedule 3.8(b) was not a true, correct or complete listing of all claims made under the Covered Contracts as of the Closing Date.

77.     Ms. Yarrish was involved in the preparation of Schedule 3.8(b), and it was incumbent on her to undertake a reasonable inquiry and investigation *before* Penn National provided Schedule 3.8(b)—the final claims register—to the Tawa Group.  Prior to the Closing,

Ms. Yarrish could have and should have compared the information on the claims register with the information contained on Penn National's internal claims database, just as PRO did after the Closing.  Had she done so, Ms. Yarrish would have recognized the discrepancies and generated a claims register that was neither inaccurate nor incomplete.  Because Ms. Yarrish did not conduct a reasonable inquiry and investigation into the completeness and accuracy of the claims register, the warranties and representations set forth in Section 3.8(b) were false "to the Knowledge of Cedent."

*The Incomplete Claims Information*

78.    When it entered into the MTA, Penn National represented and warranted in Section 3.8(c) that its files made available to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011, "to the Knowledge of Cedent at the time such files were made available," constituted *all* of the claims handling, claims processing, claims payment and other files and records maintained by or available to Penn National relating to the receipt and administration of claims in respect of the Covered Contracts and fully reflected *all* material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.

79.    At the time of the Closing, the Tawa Group relied on this representation and warranty and had no reason to question the completeness or accuracy of the claims files and records Penn National had made available between December 15, 2010 and on or about March 14, 2011.

80.    After the Closing, however, the Tawa Group came to learn that the set of claims files and records Penn National had made available between December 15, 2010 and on or about March 14, 2011, was incomplete.  That is, the Tawa Group came to learn that Penn National had

not provided the claims files and records relating to *all* of the lead paint claims reported to Penn National over the years.

81.     Consequently, Penn National significantly underestimated both the volume of future claims under the Reinsurance Agreement and the claims-handling costs PRO would incur. If Penn National had provided a complete set of claims records and files, then Tawa and PRO would have anticipated a much larger volume of claims. In that event, the Tawa Group would have required Penn National to pay at least $1.2 million as additional consideration for the work to be performed by PRO in adjusting reinsurance claims under the Administrative Services Agreement.  Alternatively, if Penn National had provided a complete set of claims records and files, then Tawa and PRO would have anticipated a much larger volume of claims and would not have agreed to administer the program and applicable third-party reinsurance agreements for a fixed Expense Premium.

82.     By making available an incomplete set of claims files and records to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011, Penn National breached the express warranty and misrepresented the facts set forth in Section 3.8(c) of the MTA. Contrary to Penn National's warranty and representation, the set of claims records and files Penn National made available during those dates was incomplete.

83.     Under Section 3.8(c) of the MTA, it was incumbent on Ms. Yarrish to undertake a reasonable inquiry and investigation to ensure that the set of claims files and records Penn National was making available to the Tawa Group contained *all* such files and records.  Had she done so, Ms. Yarrish would have recognized that the files and records Penn National was making available did not constitute *all* such files and, thus, were not true, correct and complete.  Because

Ms. Yarrish did not conduct such a reasonable inquiry and investigation, the warranties and representations set forth in Section 3.8(c) were false "to the Knowledge of Cedent."

**COUNT I**
**(RESCISSION OF THE MTA AND ANCILLARY AGREEMENTS**
**BASED ON PENN NATIONAL'S COMMON LAW FRAUD**
**IN FAILING TO DISCLOSE THE DACKMAN TENANT LIST)**

84.     Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 83 of this Complaint.

85.     Prior to the date of the MTA in connection with the Tawa Group's review and investigation of the Subject Business, Penn National had an obligation to disclose to Tawa or its Affiliates "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

86.     Accordingly, Penn National had an obligation to disclose to Tawa or its Affiliates during due diligence the data and information compiled in the Dackman Tenant List.  That data and information were material to the losses being reinsured under the Reinsurance Agreement because their disclosure would have enabled the Tawa Group to develop a much more reliable reserve estimate of future claims and, thus, to set an adequate reinsurance premium.

87.     Furthermore, when it entered into the MTA, Penn National represented and warranted that, to the Knowledge of Cedent, Penn National had, prior to the date of the MTA in connection with the Tawa Group's review and investigation of the Subject Business, fully disclosed to Tawa or its Affiliates "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

88.     This representation of fact was false because, prior to the date of the MTA in connection with the Tawa Group's review and investigation of the Subject Business, Penn

National had not disclosed to Tawa or its Affiliates the material data and information compiled in the Dackman Tenant List.  Penn National either knew this representation of fact was false or made this representation of fact with reckless indifference to the truth because, at the time of Closing, Ms. Yarrish knew that Penn National had not disclosed to Tawa or its Affiliates during their review and investigation of the Subject Business the material data and information compiled in the Dackman Tenant List.

89.     The Tawa Group relied on Penn National's assurances that it had disclosed all data and information material to the losses being reinsured under the Reinsurance Agreement and, because of the express representation and warranty to that effect contained in section 3.8(a) of the MTA, this reliance was reasonable.  Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(a).

90.     In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a).

91.     During the due diligence phase, the Tawa Group had no way of knowing that the Dackman Tenant List even existed, and the Tawa Group relied upon representations by Penn

National that exposure information, such as that included in the Dackman Tenant List, was unavailable.

92.     Penn National's false representation of full disclosure and its concealment of the Dackman Tenant List were committed with the intent to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement, and to induce Tawa and QX not to charge a higher reinsurance premium and PRO not to charge a higher or different type of Expense Premium.

93.     As a result of Penn National's common law fraud, the Tawa Group is entitled to rescind the MTA, QX is entitled to rescind the Reinsurance Agreement, and PRO is entitled to rescind the Administrative Services Agreement.

94.     Upon the entry of an Order of Rescission, Tawa and QX will restore Penn National to its pre-contractual position by returning the reinsurance premium Penn National paid less the amounts expended by QX on claims made under the Reinsurance Agreement.   In addition, upon the entry of an Order of Rescission, PRO will return any portion of the paid Expense Premium it has not yet earned, *if any*

95.     Furthermore, upon the entry of an Order of Rescission, Tawa will be entitled to an order extinguishing its obligations under the Guaranty Agreement, which are absolute and enforceable "except to the extent arising as a result of fraud or willful misconduct of the Cedent," and to an order restoring to Tawa the "Additional Security Amount" it paid into the trust account established by the Trust Agreement and any additional amounts it invested in connection with the MTA.

## COUNT II
### (RESCISSION OF THE MTA AND ANCILLARY AGREEMENTS BASED ON PENN NATIONAL'S COMMON LAW FRAUD IN FURNISHING AN INCOMPLETE CLAIMS REGISTER)

96.     Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 95 of this Complaint.

97.     Upon the Closing of the MTA, Penn National had an obligation to furnish a claims register containing a "true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date."

98.     The claims register Penn National furnished upon Closing, *i.e.*, Schedule 3.8(b), was not true, correct or complete.  On the contrary, the claims register omitted a substantial number of lead paint claims that had been reported to Penn National and understated by at least 10% the amount Penn National had paid out in claims over the years.

99.     Furthermore, when it entered into the MTA, Penn National represented and warranted that, to the Knowledge of Cedent, Penn National had provided a claims register containing a "true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date."  This representation of fact was false because, at the time of the Closing, the claims register was incomplete and inaccurate "to the Knowledge of Cedent."  Penn National either knew this representation of fact was false or made this representation of fact with reckless indifference to the truth.

100.    The Tawa Group relied on Penn National's assurances that the claims register was "a true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date," and because of the express representation and warranty to that effect contained in Section 3.8(b) of the MTA, this reliance was reasonable.  Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to

enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(b).

101.    In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(b). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(b).

102.    At the time of the Closing, the Tawa Group had no way of knowing that the claims register was incomplete and inaccurate because, at that time, the Tawa Group did not have access to Penn National's internal claims database.

103.    Penn National's false representations concerning the claims register were committed with the intent to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement.  Had Penn National disclosed the truth about its experience with lead paint claims, the Tawa Group would have either insisted that the transaction be consummated on drastically different terms or abandoned the transaction altogether.

104.    Specifically, had Penn National furnished a complete, truthful and accurate claims register, then the Tawa Group, if it would not have abandoned the deal altogether, would have either required Penn National to pay at least $1.2 million as additional consideration for the work to be performed by PRO in adjusting reinsurance claims under the Administrative Services

Agreement or rejected the concept of charging Penn National a fixed Expense Premium as compensation for PRO's services.

105.    As a result of Penn National's common law fraud, the Tawa Group is entitled to rescind the MTA, QX is entitled to rescind the Reinsurance Agreement, and PRO is entitled to rescind the Administrative Services Agreement.

106.    Upon the entry of an Order of Rescission, Tawa and QX will restore Penn National to its pre-contractual position by returning the reinsurance premium Penn National paid less the amounts expended by QX on claims made under the Reinsurance Agreement.   In addition, upon the entry of an Order of Rescission, PRO will return any portion of the paid Expense Premium it has not yet earned, *if any*.

107.    Furthermore, upon the entry of an Order of Rescission, Tawa will be entitled to an order extinguishing its obligations under the Guaranty Agreement, which are absolute and enforceable "except to the extent arising as a result of fraud or willful misconduct of the Cedent," and to an order restoring to Tawa the "Additional Security Amount" it paid into the trust account established by the Trust Agreement and any additional amounts it invested in connection with the MTA.

## COUNT III
### (RESCISSION OF THE MTA AND ANCILLARY AGREEMENTS BASED ON PENN NATIONAL'S COMMON LAW FRAUD IN FAILING TO MAKE AVAILABLE COMPLETE CLAIMS FILES AND RECORDS)

108.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 107 of this Complaint.

109.    Between December 15, 2010 and on or about March 14, 2011, Penn National had an obligation to make available to Tawa and its Affiliates *all* of its claims files and records

relating to the receipt and administration of claims in respect of the Covered Contracts and to ensure that the claim files and records it made available during that period fully reflected all material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.  As Tawa and its Affiliates later came to learn, however, Penn National failed to satisfy this obligation.

110.   Furthermore, when it entered into the MTA, Penn National represented and warranted that, "to the Knowledge of Cedent," Penn National had, between December 15, 2010 and on or about March 14, 2011, made available to Tawa and its Affiliates *all* of its claims files and records relating to the receipt and administration of claims in respect of the Covered Contractions and that the claim files and records it made available during that period fully reflected *all* material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.

111.   This representation of fact was false because the set of claims files and records Penn National had made available between December 15, 2010 and on or about March 14, 2011 was incomplete "to the Knowledge of Cedent."  Penn National either knew this representation of fact was false or made this representation of fact with reckless indifference to the truth.

112.   The Tawa Group relied on Penn National's assurances that Penn National had made *all* of its claims files and records available during the December 15, 2010 to March 14, 2011 period, and because of the express representation and warranty to that effect contained in Section 3.8(c) of the MTA, this reliance was reasonable.  Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(c).

113.    In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(c). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(c).

114.    At the time of the Closing, the Tawa Group had no way of knowing that the set of claims files and records Penn National had made available between December 15, 2010 and on or about March 14, 2011 was incomplete.

115.    Penn National's false representations concerning the completeness of its claims files and records were committed with the intent to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement.  Had Penn National disclosed the truth concerning its experience with lead paint claims, the Tawa Group would have either insisted that the transaction be consummated on drastically different terms or abandoned the transaction altogether.

116.    Specifically, had Penn National made *all* of its claim files and records available to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011, then the Tawa Group, if it would not have abandoned the deal altogether, would have either required Penn National to pay at least $1.2 million as additional consideration for the work to be performed by PRO in adjusting reinsurance claims under the Administrative Services Agreement

or rejected the concept of charging Penn National a fixed Expense Premium as consideration for PRO's services.

117.    As a result of Penn National's common law fraud, the Tawa Group is entitled to rescind the MTA, QX is entitled to rescind the Reinsurance Agreement, and PRO is entitled to rescind the Administrative Services Agreement.

118.    Upon the entry of an Order of Rescission, Tawa and QX will restore Penn National to its pre-contractual position by returning the reinsurance premium Penn National paid less the amounts expended by QX on claims made under the Reinsurance Agreement.   In addition, upon the entry of an Order of Rescission, PRO will return any portion of the paid Expense Premium it has not yet earned, *if any*.

119.    Furthermore, upon the entry of an Order of Rescission, Tawa will be entitled to an order extinguishing its obligations under the Guaranty Agreement, which are absolute and enforceable "except to the extent arising as a result of fraud or willful misconduct of the Cedent," and to an order restoring to Tawa the "Additional Security Amount" it paid into the trust account established by the Trust Agreement and any additional amounts it invested in connection with the MTA.

## COUNT IV
### (RESCISSION OF THE MTA AND ANCILLARY AGREEMENTS BASED ON PENN NATIONAL'S EQUITABLE FRAUD IN FAILING TO DISCLOSE THE DACKMAN TENANT LIST)

120.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 119 of this Complaint.

121.    Prior to the date of the MTA in connection with the Tawa Group's review and investigation of the Subject Business, Penn National had an obligation to disclose to Tawa or its

Affiliates "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

122.    Accordingly, Penn National had an obligation to disclose to Tawa or its Affiliates the data and information compiled in the Dackman Tenant List.  That data and information were material to the losses being reinsured under the Reinsurance Agreement because their disclosure during the due diligence process would have enabled the Tawa Group to develop a much more reliable reserve estimate for future claims and, thus, to set an adequate reinsurance premium.

123.    Furthermore, when it entered into the MTA, Penn National represented and warranted that, to the Knowledge of Cedent, Penn National had, prior to the date of the MTA in connection with their review and investigation of the Subject Business, fully disclosed to Tawa or its Affiliates "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

124.    This representation of fact was false because, during the due diligence phase, Penn National had not disclosed to Tawa or its Affiliates the data and information compiled in the Dackman Tenant List.

125.    The Tawa Group relied on Penn National's assurances that it had disclosed all data and information material to the losses being reinsured under the Reinsurance Agreement and, because of the express representation and warranty to that effect contained in section 3.8(a) of the MTA, this reliance was reasonable.  Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(a).

126.   In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a).

127.   During the due diligence phase, the Tawa Group had no way of knowing that the Dackman Tenant List even existed, and the Tawa Group understood from Penn National that exposure information, such as that included in the Dackman Tenant List, was unavailable.

128.   Penn National's false representation of full disclosure and its failure to disclose the Dackman Tenant List were intended to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement, and to induce Tawa and QX not to charge a higher reinsurance premium and PRO not to charge a higher or different type of Expense Premium.

129.   As a result of Penn National's equitable fraud, the Tawa Group is entitled to rescind and cancel the MTA, QX is entitled to rescind and cancel the Reinsurance Agreement, and PRO is entitled to rescind and cancel the Administrative Services Agreement.

130.   Upon the entry of an Order of Rescission, Tawa and QX will restore Penn National to its pre-contractual position by returning the reinsurance premium Penn National paid less the amounts expended by QX on claims made under the Reinsurance Agreement.   In

addition, upon the entry of an Order of Rescission, PRO will return any portion of the paid

Expense Premium it has not yet earned, *if any*

131.    Furthermore, upon the entry of an Order of Rescission, Tawa will be entitled to an

order extinguishing its obligations under the Guaranty Agreement, which are absolute and

enforceable "except to the extent arising as a result of fraud or willful misconduct of the

Cedent," and to an order restoring to Tawa the "Additional Security Amount" it paid into the

trust account established by the Trust Agreement and any additional amounts it invested in

connection with the MTA.

## COUNT V
### (RESCISSION OF THE MTA AND ANCILLARY AGREEMENTS BASED ON PENN NATIONAL'S EQUITABLE FRAUD IN FURNISHING AN INCOMPLETE CLAIMS REGISTER)

132.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in

paragraphs 1 though 131 of this Complaint.

133.    Upon the Closing of the MTA, Penn National had an obligation to furnish a

claims register containing a "true, correct and complete listing of all claims made under the

Covered Contracts as of the Closing Date."

134.    The claims register Penn National furnished upon Closing, *i.e.*, Schedule 3.8(b),

was not true, correct or complete.  On the contrary, the claims register omitted a substantial

number of lead paint claims that had been reported to Penn National and understated by at least

10% the amount Penn National had paid out in claims over the years.

135.    Furthermore, when it entered into the MTA, Penn National represented and

warranted that, to the Knowledge of Cedent, Penn National had provided a claims register

containing a "true, correct and complete listing of all claims made under the Covered Contracts

as of the Closing Date." This representation of fact was false because, at the time of the Closing, the claims register was incomplete and inaccurate "to the Knowledge of Cedent."

136.     The Tawa Group relied on Penn National's assurances that the claims register was "a true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date," and because of the express representation and warranty to that effect contained in Section 3.8(b) of the MTA, this reliance was reasonable. Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(b).

137.     In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(b). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(b).

138.     At the time of the Closing, the Tawa Group had no way of knowing that the claims register was incomplete and inaccurate because, at that time, the Tawa Group did not have access to Penn National's internal claims database.

139.     Penn National's false representations concerning the claims register were intended to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement. Had Penn National

disclosed the truth about its experience with lead paint claims, the Tawa Group would have either insisted that the transaction be consummated on drastically different terms or abandoned the transaction altogether.

140.    Specifically, had Penn National furnished a complete, truthful and accurate claims register, then Tawa, if it would not have abandoned the deal altogether, would have either required Penn National to pay at least $1.2 million as additional consideration for the work to be performed by PRO in adjusting reinsurance claims under the Administrative Services Agreement or rejected the concept of charging Penn National a fixed Expense Premium as compensation for PRO's services.

141.    As a result of Penn National's equitable fraud, the Tawa Group is entitled to rescind and cancel the MTA, QX is entitled to rescind and cancel the Reinsurance Agreement, and PRO is entitled to rescind and cancel the Administrative Services Agreement.

142.    Upon the entry of an Order of Rescission, Tawa and QX will restore Penn National to its pre-contractual position by returning the reinsurance premium Penn National paid less the amounts expended by QX on claims made under the Reinsurance Agreement.  In addition, upon the entry of an Order of Rescission, PRO will return any portion of the paid Expense Premium it has not yet earned, *if any*.

143.    Furthermore, upon the entry of an Order of Rescission, Tawa will be entitled to an order extinguishing its obligations under the Guaranty Agreement, which are absolute and enforceable "except to the extent arising as a result of fraud or willful misconduct of the Cedent," and to an order restoring to Tawa the "Additional Security Amount" it paid into the trust account established by the Trust Agreement and any additional amounts it invested in connection with the MTA.

## COUNT VI
### (RESCISSION OF THE MTA AND ANCILLARY AGREEMENTS BASED ON PENN NATIONAL'S EQUITABLE FRAUD IN FAILING TO MAKE AVAILABLE COMPLETE CLAIMS FILES AND RECORDS)

144.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 143 of this Complaint.

145.    Between December 15, 2010 and on or about March 14, 2011, Penn National had an obligation to make available to Tawa and its Affiliates *all* of its claims files and records relating to the receipt and administration of claims in respect of the Covered Contracts and to ensure that the claim files and records it made available during that period fully reflected all material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.  As Tawa and its Affiliates later came to learn, however, Penn National failed to satisfy this obligation.

146.    Furthermore, when it entered into the MTA, Penn National represented and warranted that, "to the Knowledge of Cedent," Penn National had, between December 15, 2010 and on or about March 14, 2011 made available to Tawa and its Affiliates *all* of its claims files and records relating to the receipt and administration of claims in respect of the Covered Contractions and that the claim files and records it made available during that period fully reflected all material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.  This representation of fact was false because the set of claims files and records Penn National had made available between December 15, 2010 and on or about March 14, 2011 was incomplete.

147.    The Tawa Group relied on Penn National's assurances that Penn National had made *all* of its claims files and records available during the December 15, 2010 to March 14,

2011 period, and because of the express representation and warranty to that effect contained in Section 3.8(c) of the MTA, this reliance was reasonable.  Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(c).

148.   In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(c). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(c).

149.   At the time of the Closing, the Tawa Group had no way of knowing that the set of claims files and records Penn National had made available between December 15, 2010 and on or about March 14, 2011 was incomplete.

150.   Penn National's false representations concerning the completeness of its claims files and records were intended to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement. Had Penn National disclosed the truth about its experience with lead paint claims, the Tawa Group would have either insisted that the transaction be consummated on drastically different terms or abandoned the transaction altogether.

151.    Specifically, had Penn National made *all* of its claim files and records available to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011, then the Tawa Group, if it would not have abandoned the deal altogether, would have either required Penn National to pay at least $1.2 million as additional consideration for the work to be performed by PRO in adjusting reinsurance claims under the Administrative Services Agreement or rejected the concept of charging Penn National a fixed Expense Premium as consideration for PRO's services.

152.    As a result of Penn National's equitable fraud, the Tawa Group is entitled to rescind and cancel the MTA, QX is entitled to rescind and cancel the Reinsurance Agreement, and PRO is entitled to rescind and cancel the Administrative Services Agreement.

153.    Upon the entry of an Order of Rescission, Tawa and QX will restore Penn National to its pre-contractual position by returning the reinsurance premium Penn National paid less the amounts expended by QX on claims made under the Reinsurance Agreement.   In addition, upon the entry of an Order of Rescission, PRO will return any portion of the paid Expense Premium it has not yet earned, *if any*.

154.    Furthermore, upon the entry of an Order of Rescission, Tawa will be entitled to an order extinguishing its obligations under the Guaranty Agreement, which are absolute and enforceable "except to the extent arising as a result of fraud or willful misconduct of the Cedent," and to an order restoring to Tawa the "Additional Security Amount" it paid into the trust account established by the Trust Agreement and any additional amounts it invested in connection with the MTA.

## COUNT VII
### (COMMON LAW FRAUD)

155.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 154 of this Complaint.

156.    When it entered into the MTA, Penn National represented and warranted that, to the Knowledge of Cedent, Penn National had fully disclosed to Tawa or its Affiliates, during their review and investigation of the Subject Business, "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

157.    This representation of fact was false because, at the time of the Closing, Ms. Yarrish knew that Penn National had not disclosed to Tawa or its Affiliates during their review and investigation of the Subject Business the data and information compiled in the Dackman Tenant List, which was not excluded from Books and Records.  The data and information compiled in the Dackman Tenant List were material to the losses being reinsured under the Reinsurance Agreement because their disclosure during the due diligence process would have enabled the Tawa Group to develop a much more reliable reserve estimate for future claims and, thus, to set an adequate reinsurance premium.

158.    Penn National's false representation of full disclosure and its concealment of the Dackman Tenant List were committed with the intent to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement, and to induce Tawa and QX not to charge a higher reinsurance premium and PRO not to charge a higher or different type of Expense Premium.

159.    The Tawa Group relied on Penn National's assurances that it had completely disclosed all data and information material to the losses being reinsured under the Reinsurance

Agreement and, because of the express representation and warranty to that effect contained in Section 3.8(a) of the MTA, this reliance was reasonable. Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(a).

160. In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a).

161. During the due diligence phase, the Tawa Group had no way of knowing that the Dackman Tenant List even existed, and the Tawa Group understood from Penn National that exposure information, such as that included in the Dackman Tenant List, was unavailable.

162. By concealing the Dackman Tenant List, Penn National succeeded in deceiving the Tawa Group into accepting the transaction at the agreed reinsurance premium. Had Penn National disclosed the Dackman Tenant List during the due diligence phase, that reinsurance premium would have been drastically higher. Thus, as a result of its intentional or reckless concealment of the Dackman Tenant List, Penn National significantly underpaid for its reinsurance.

163.    Tawa and QX have been damaged by the amount by which Penn National underpaid for its reinsurance due to its concealment of exposure information—namely, the Dackman Tenant List—that would have enabled Tawa to price the transaction adequately.   That amount was between $17 million and $50 million.

164.    Moreover, the Tawa Group has been damaged by Penn National's failure to provide the Tawa Group prior to the Closing a complete and accurate claims register and complete claims information.   PRO has been damaged by the amount by which Penn National underpaid for PRO's claims adjusting services under the Administrative Services Agreement. That amount is in excess of $1.2 million.

165.    In addition, the Tawa Group has been damaged by the amounts it expended in connection with MTA, including, but not limited to, the amount paid to Milliman to review Tawa's in-house projections and to provide independent reserve estimates, attorneys' fees, banking costs and miscellaneous internal costs.

166.    Although the MTA purports to limit Penn National's liability and the remedies available on account of any breach, inaccuracy, violation or nonfulfillment of the MTA (including any representation or warranty contained in the MTA), those limitations expressly do not apply to any claim or cause of action the Tawa Group might have against Penn National arising from fraud or willful misconduct.   That exception plainly applies in this case.

**COUNT VIII**
**(EQUITABLE FRAUD)**

167.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 166 of this Complaint.

168.    When it entered into the MTA, Penn National represented and warranted that, to the Knowledge of Cedent, Penn National had fully disclosed to Tawa or its Affiliates during their

review and investigation of the Subject Business "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

169.    This representation of fact was false because, at the time of the Closing, Ms. Yarrish knew that Penn National had not disclosed to Tawa or its Affiliates during their review and investigation of the Subject Business the data and information compiled in the Dackman Tenant List, which was not excluded from Books and Records.   The data and information compiled in the Dackman Tenant List were material to the losses being reinsured under the Reinsurance Agreement because their disclosure during the due diligence process would have enabled the Tawa Group to develop a much more reliable reserve estimate for future claims and, thus, to set an adequate reinsurance premium.

170.    Penn National's false representation of full disclosure and its failure to disclose the Dackman Tenant List were intended to induce the Tawa Group to enter into the MTA, QX to enter into the Reinsurance Agreement, and PRO to enter into the Administrative Services Agreement, and to induce Tawa and QX not to charge a higher reinsurance premium and PRO not to charge a higher or different type of Expense Premium.

171.    The Tawa Group relied on Penn National's assurances that it had completely disclosed all data and information material to the losses being reinsured under the Reinsurance Agreement and, because of the express representation and warranty to that effect contained in Section 3.8(a) of the MTA, this reliance was reasonable.   Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Section 3.8(a).

172.    In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a). Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Section 3.8(a).

173.    During the due diligence phase, the Tawa Group had no way of knowing that the Dackman Tenant List even existed, and the Tawa Group understood from Penn National that exposure information, such as that included in the Dackman Tenant List, was unavailable.

174.    By failing to disclose the Dackman Tenant List, Penn National induced the Tawa Group into accepting the transaction at the agreed reinsurance premium.  Had Penn National disclosed the Dackman Tenant List during the due diligence phase, that reinsurance premium would have been drastically higher.  Thus, as a result of its failure to disclose the Dackman Tenant List, Penn National significantly underpaid for its reinsurance.

175.    Tawa and QX have been damaged by the amount by which Penn National underpaid for its reinsurance due to its concealment of exposure information—namely, the Dackman Tenant List —that would have enabled Tawa to price the transaction adequately.  That amount was between $17 million and $50 million.

176.    Moreover, the Tawa Group has been damaged by Penn National's failure to provide the Tawa Group prior to the Closing a complete and accurate claims register and complete claims information.  PRO has been damaged by the amount by which Penn National

underpaid for PRO's claims adjusting services under the Administrative Services Agreement. That amount is in excess of $1.2 million.

177.    In addition, the Tawa Group has been damaged by the amounts it expended in connection with MTA, including, but not limited to, the amount paid to Milliman to review Tawa's in-house projections and to provide independent reserve estimates, attorneys' fees, banking costs and miscellaneous internal costs.

178.    Although the MTA purports to limit Penn National's liability and the remedies available on account of any breach, inaccuracy, violation or nonfulfillment of the MTA (including any representation or warranty contained in the MTA), those limitations expressly do not apply to any claim or cause of action the Tawa Group might have against Penn National arising from fraud.  That exception plainly applies in this case.

### COUNT IX
### (CONTRACTUAL INDEMNITY BASED ON PENN NATIONAL'S
### FRAUDULENT BREACH OF WARRANTY)

179.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 178 of this Complaint.

180.    When it entered into the MTA, Penn National expressly warranted in Section 3.8(a) that, to the Knowledge of Cedent, Penn National had, prior to the date of the MTA in connection with the Tawa Group's review and investigation of the Subject Business, fully disclosed to Tawa or its Affiliates "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

181.    This warranty was false because Ms. Yarrish knew that Penn National had not, prior to the date of the MTA in connection with their review and investigation of the Subject

Business, disclosed to Tawa or its Affiliates the Dackman Tenant List, which was not excluded from Books and Records.  The Dackman Tenant List was material to the losses being reinsured under the Reinsurance Agreement because its disclosure during the due diligence process would have enabled the Tawa Group to develop a much more reliable reserve estimate for future claims and, thus, to set an adequate reinsurance premium.

182.    Furthermore, when it entered into the MTA, Penn National represented and warranted in Section 3.8(b) that, to the Knowledge of Cedent, Penn National had provided a claims register containing a "true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date."

183.    This representation of fact was false because, at the time of the Closing, the claims register was incomplete and inaccurate "to the Knowledge of Cedent."

184.    In addition, when it entered into the MTA, Penn National represented and warranted in Section 3.8(c) that, to the Knowledge of Cedent, the files Penn National had made available to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011 constituted *all* of the claims handling, claims processing, claims payment and other files and records maintained by or available to Penn National relating to the receipt and administration of claims in respect of Covered Contracts and fully reflected *all* material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.

185.    This representation of fact was false because the set of claims files and records Penn National had made available to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011, was incomplete "to the Knowledge of Cedent."

186.    The Tawa Group relied on Penn National's various representations and warranties in Article III of the MTA, and this reliance was reasonable.  Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Sections 3.8(a), 3.8(b) and 3.8(c).

187.    In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Sections 3.8(a), 3.8(b) and 3.8(c).  Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Sections 3.8(a), 3.8(b) and 3.8(c).

188.    Under Section 6.1 of the MTA, Penn National agreed, subject to the limitations set forth in Article IV of the MTA and certain other qualifications, to indemnify the Tawa Group, from and after the Closing, against any Loss to the extent resulting from, among other things, "any breach or inaccuracy of any representation or warranty contained in ARTICLE III of [the MTA]."

189.    Although Section 6.4(d) of the MTA imposes a $25,000 Indemnity Threshold and an $8,000,000 Indemnity Cap on Penn National's indemnification obligations, Section 6.4(i) provides that "Nothing contained in this ARTICLE IV will limit in any way any remedies

available to any Party or its Affiliates in respect of fraud or willful misconduct in connection with the transactions contemplated hereby."

190.    Because the Tawa Group has incurred Loss resulting from Penn National's breach of the representations and warranties set forth in Section 3.8(a) of the MTA and because those breaches were the result of fraud or willful misconduct on Penn National's part, Penn National must indemnify that loss without regard to the Indemnity Threshold or the Indemnity Cap.

191.    As a result of Penn National's breaches of the representations and warranties set forth in Section 3.8(a) of the MTA, Tawa and QX have been damaged by, and are entitled to indemnification for, the amount by which Penn National underpaid for its reinsurance.  That amount was between $17 million and $50 million.

192.    Furthermore, as a result Penn National's breach of the representations and warranties set forth in Sections 3.8(b) and 3.8(c) of the MTA, the Tawa Group has been damaged and is entitled to indemnification from Penn National.  Tawa and QX have been damaged by, and are entitled to indemnification for, the amount by which Penn National underpaid for its reinsurance.  That amount was between $17 million and $50 million.  PRO has been damaged by and is entitled to indemnification for, the amount by which Penn National underpaid for PRO's claims adjusting services under the Administrative Services Agreement.  That amount is in excess of $1.2 million.

## COUNT X
### (CONTRACTUAL INDEMNITY BASED ON PENN NATIONAL'S BREACH OF WARRANTY)

193.    Plaintiffs reallege and incorporate as if fully stated herein the allegations in paragraphs 1 through 192 of this Complaint.

194.    When it entered into the MTA, Penn National expressly warranted in Section 3.8(a) that, to the Knowledge of Cedent, Penn National had, prior to the date of the MTA in connection with the Tawa group's review and investigation of the Subject Business, fully disclosed to Tawa or its Affiliates "all data and information material to the losses being reinsured under the Reinsurance Agreement," except as and to the extent excluded from Books and Records.

195.    This warranty was false because Ms. Yarrish knew that Penn National had not, prior to the date of the MTA in connection with their review and investigation of the Subject Business, disclosed to Tawa or its Affiliates the Dackman Tenant List, which was not excluded from Books and Records.  The Dackman Tenant List was material to the losses being reinsured under the Reinsurance Agreement because its disclosure during the due diligence process would have enabled the Tawa Group to develop a much more reliable reserve estimate for future claims and, thus, to set an adequate reinsurance premium.

196.    Furthermore, when it entered into the MTA, Penn National represented and warranted in Section 3.8(b) that, to the Knowledge of Cedent, Penn National had provided a claims register containing a "true, correct and complete listing of all claims made under the Covered Contracts as of the Closing Date."

197.    This representation of fact was false because, at the time of the Closing, the claims register was incomplete and inaccurate "to the Knowledge of Cedent."

198.    In addition, when it entered into the MTA, Penn National represented and warranted in Section 3.8(c) that, to the Knowledge of Cedent, the files Penn National had made available to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011 constituted *all* of the claims handling, claims processing, claims payment and other files and

51

records maintained by or available to Penn National relating to the receipt and administration of claims in respect of Covered Contracts and fully reflected *all* material claims data and information in Penn National's possession with respect to claims made under the Covered Contracts.

199.     This representation of fact was false because the set of claims files and records Penn National had made available to Tawa and its Affiliates between December 15, 2010 and on or about March 14, 2011, was incomplete "to the Knowledge of Cedent."

200.     The Tawa Group relied on Penn National's various representations and warranties in Article III of the MTA, and this reliance was reasonable.  Indeed, Section 3.14 manifests the parties' mutual understanding and intent that the Tawa Group would rely on, and be induced to enter into the MTA based on, the representations and warranties set forth in Article III, including those set forth in Sections 3.8(a), 3.8(b) and 3.8(c).

201.     In addition, Section 21.1 of the Reinsurance Agreement manifests Penn National's and QX's mutual understanding and intent that QX would rely on, and be induced to enter into the Reinsurance Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Sections 3.8(a), 3.8(b) and 3.8(c).  Similarly, Section 18.1 of the Administrative Services Agreement manifests Penn National's and PRO's mutual understanding and intent that PRO would rely on, and be induced to enter into the Administrative Services Agreement based on, the representations and warranties of Penn National set forth in Article III of the MTA, including those set forth in Sections 3.8(a), 3.8(b) and 3.8(c).

202.     Under Section 6.1 of the MTA, Penn National agreed, subject to the limitations set forth in Article IV of the MTA and certain other qualifications, to indemnify the Tawa Group,

from and after the Closing, against any Loss to the extent resulting from, among other things, "any breach or inaccuracy of any representation or warranty contained in ARTICLE III of [the MTA]."

203.    Section 6.4(d) of the MTA imposes a $25,000 Indemnity Threshold and an $8,000,000 Indemnity Cap on Penn National's indemnification obligations.  Because the Tawa Group has incurred Loss resulting from Penn National's breach of the representations and warranties set forth in Sections 3.8(a), 3.8(b) and 3.8(c) of the MTA, Penn National must indemnify that Loss up to the $8,000,000 Indemnity Cap.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Tawa, QX, and PRO respectfully request this Court to enter judgment in their favor and against Penn National and grant them the following relief:

1.    On Count I, an order rescinding the MTA, the Reinsurance Agreement and the Administrative Services Agreement, extinguishing Tawa's obligations under the Guaranty Agreement, and restoring the parties to their pre-contractual financial positions;

2.    On Count II, in the alternative, an order rescinding the MTA, the Reinsurance Agreement and the Administrative Services Agreement, extinguishing Tawa's obligations under the Guaranty Agreement, and restoring the parties to their pre-contractual financial positions;

3.    On Count III, in the alternative, an order rescinding the MTA, the Reinsurance Agreement and the Administrative Services Agreement, extinguishing Tawa's obligations under the Guaranty Agreement, and restoring the parties to their pre-contractual financial positions;

4.    On Count IV, in the alternative, an order rescinding the MTA, the Reinsurance Agreement and the Administrative Services Agreement, extinguishing Tawa's obligations under the Guaranty Agreement, and restoring the parties to their pre-contractual financial positions;

5.    On Count V, in the alternative, an order rescinding the MTA, the Reinsurance Agreement and the Administrative Services Agreement, extinguishing Tawa's obligations under the Guaranty Agreement, and restoring the parties to their pre-contractual financial positions;

6.      On Count VI, in the alternative, an order rescinding the MTA, the Reinsurance Agreement and the Administrative Services Agreement, extinguishing Tawa's obligations under the Guaranty Agreement, and restoring the parties to their pre-contractual financial positions;

7.      On Count VII, in the alternative, an award of compensatory damages against Penn National;

8.      On Count VIII, in the alternative, an award of compensatory damages against Penn National;

9.      On Count IX, in the alternative, an award of compensatory damages against Penn National;

10.      On Count X, in the alternative, an award of compensatory damages against Penn National in the amount of $8,000,000;

11.      An award of Tawa's, QX's and PRO's attorneys' fees and costs;

12.      Pre-judgment and post-judgment interest; and

13.      Such other and further relief this Court may deem just and proper.

Respectfully submitted,

SEITZ ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

Edward F. Ruberry
Ellen D. Jenkins
RUBERRY, STALMACK & GARVEY, LLC
500 W. Madison Street, Suite 2300
Chicago, IL 60661
(312) 466-8050
Ed.Ruberry@rsg-law.com
Ellen.Jenkins@rsg-law.com

*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (Bar No. 2237)
David E. Ross (Bar No. 5228)
100 S. West Street, Suite 400
Wilmington, DE 19801
(302) 576-1600
cseitz@seitzross.com
dross@seitzross.com

*Counsel for Plaintiffs Tawa plc, QX Reinsurance Company Limited and PRO IS, Inc.*

Dated:  August 15, 2013