# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAWA, PLC, QX REINSURANCE COMPANY LIMITED and PRO IS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 13-1427-LPS |
| v. | ) | |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## OPENING BRIEF OF DEFENDANT
## IN SUPPORT OF ITS MOTION TO DISMISS

Todd C. Schiltz (I.D. No. 3253)
Lindsay O. Clizbe (I.D. No. 5321)
DRINKER BIDDLE & REATH LLC
1100 N. Market Street
Suite 1000
Wilmington, DE  19801-1254
Telephone:  (302) 467-4200
Facsimile:  (302) 467-4201
todd.schiltz@dbr.com
lindsay.clizbe@dbr.com

*Counsel to Defendant*
*Penn National Mutual Casualty Insurance*
*Company*

September 18, 2013

# **TABLE OF CONTENTS**

SUMMARY OF THE ARGUMENT ................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

    A.    Sections 3.8(a), (b) and (c) Of The Master Transaction Agreement ......................... 4

    B.    Sections 6.3 And 6.4 Of The Master Transaction Agreement ................................... 5

    C.    The No Extra-Contractual Representations, Anti-Reliance and Liability
           Disclaimer Provisions of the MTA ........................................................................... 5

    D.    Other Contractual Provisions .................................................................................... 6

    E.    The Dackman Tenant List .......................................................................................... 6

    F.    Plaintiffs' Claims Notice ............................................................................................ 8

    G    Plaintiffs' Complaint .................................................................................................. 9

ARGUMENT ..................................................................................................................... 9

I.      THE APPLICABLE STANDARD OF REVIEW .................................................... 9

II.     APPLICABLE DELAWARE LAW ........................................................................ 10

III.    PLAINTIFFS' EXTRA-CONTRACTUAL FRAUD CLAIMS FAIL .................... 12

IV.    PLAINTIFFS' EQUITABLE FRAUD CLAIMS FAIL ......................................... 13

    A.    The Knowledge Qualifier Bars Plaintiffs' Equitable Fraud Claims ....................... 13

    B.    Plaintiffs' Equitable Fraud Claims Fail Because
           Plaintiffs Have Not Invoked Equity's Special Jurisdiction ..................................... 14

V.     PLAINTIFFS' CONTRACTUAL MISREPRESENTATION AND
       BREACH OF CONTRACT CLAIMS FAIL ........................................................... 16

    A.    Plaintiffs' Failure To Allege They Submitted A Claims Notice Bars
           Their Contractual Misrepresentation and Breach of Contract Claims ..................... 16

    B.    Plaintiffs' Section 3.8(a) Claims Fail ....................................................................... 17

    C.    Plaintiffs' Section 3.8(b) Claims Fail ....................................................................... 19

CONCLUSION ................................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                       **Page(s)**

*Abry Partners V, L.P. v. F & W Acquisition LLC,*
    891 A.2d 1032 (Del. Ch. 2006)...................................................................11, 14

*Airborne Health, Inc. v. Squid Soap, LP,*
    984 A.2d 126 (Del. Ch. 2009)............................................................................10

*Ameristar Casinos, Inc. v. Resorts Int'l Holdings, LLC,*
    2010 WL 1875631 (Del. Ch. May 11, 2010).................................................11, 15

*Aschcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................................9, 10, 18

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................9, 10, 18

*Conley v. Gibson,*
    355 U.S. 41 (1957)...........................................................................................9

*Cornell Glasgow, LLC v. La Grange Props., LLC,*
    2012 WL 6840625 (Del. Super. Dec. 7, 2012) ..................................................17

*DCV Holdings, Inc. v. ConAgra, Inc.,*
    889 A.2d 954 (Del. 2005) ..................................................................................4

*DCV Holdings, Inc. v. Conagra, Inc.,*
    2002 WL 508343 (Del. Super. Apr. 1, 2002) ....................................................12

*E.I. du Pont de Nemours v. HEM Research, Inc.,*
    1989 WL 122053 (Del. Ch. Oct. 13, 1989) ......................................................15

*Great Lakes Chem. Corp. v. Pharmacia Corp.,*
    788 A.2d 544 (Del. Ch. 2001)..........................................................................12

*GRT, Inc. v. Marathon GTF Tech. Ltd.,*
    2011 WL 2682898 (Del. Ch. July 11, 2011)................................................14, 17

*Harper v. Del. Valley Broadcasters,*
    743 F.Supp. 1076 (D. Del. 1990), *aff'd,* 932 F.2d 959 (3d Cir.1991)....................17

*In re Advanta Corp. Sec. Litig.,*
    180 F.3d 525 (3d Cir. 1999)..............................................................................19

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)............................................................................10

*Kolber v. Body Central Corp.*,
  2012 WL 3095324 (D. Del. July 30, 2012) ........................................................15

*Kronenberg v. Katz*,
  872 A.2d 568 (Del. Ch. 2004)...........................................................................11

*Libeau v. Fox*,
  880 A.2d 1049 (Del. Ch. 2005)..........................................................................14

*Metro Commc'n Corp. BVI v. Advanced Mobilcomm Tech., Inc.*,
  854 A.2d 121 (Del. Ch. 2004)......................................................................14, 19

*Northpointe Holdings, Inc. v. Nationwide Emerging Managers, LLC*,
  2010 WL 3707677 (Del. Super. Sept. 14, 2010) ............................................15, 16

*Perlmutter v. Salton, Inc.*,
  2010 WL 3834040 (D. Del. Sept. 24, 2010) .......................................................15

*Pfizer Inc. v. Elan Pharm. Research Corp.*,
  812 F. Supp. 1352 (D. Del. 1993).......................................................................3

*Phoenix Equity Grp. LLC v. BPG Justison P2 LLC*,
  2010 WL 1223619 (Del. Ch. Mar. 25, 2010)...................................................10, 12

*Prestancia Management Group, Inc. v. Virginia Heritage Foundation, II LLC*,
  2005 WL 1364616 (Del. Ch. May 27, 2005) ........................................................16

*Price Auto. Grp. v. Dannemann*,
  2002 WL 31260007 (Del. Super. Sept. 25, 2002) ............................................4, 13

*Progressive Internat'l Corp. v. E.I. du Pont de Nemours & Co.*,
  2002 WL 1558382 (Del. Ch. July 9, 2002)......................................................11, 12

*Rockefeller Center Properties, Inc. Securities Litig.*,
  311 F.3d 198 (3d Cir. 2002)..............................................................................10

*Southern Track & Pump, Inc. v. Terex Corp.*,
  722 F. Supp.2d 509 (D. Del. 2010)......................................................................4

*Woods v. Maytag Co.*,
  807 F. Supp.2d 112 (E.D.N.Y. 2011) ..................................................................20

**OTHER AUTHORITIES**

Kling, Simon & Goldman, *Summary of Acquisition Agreements*,
  51 U. Miami L. Rev. 779, 792-93 (1997) ........................................................4, 13

Fed. R. Civ. P. 9(b) .................................................................................... passim

Fed. R. Civ. P.12(b)(6)...............................................................................3, 9, 19

## SUMMARY OF THE ARGUMENT

This is another in a growing number of cases in which sophisticated entities attempt to manufacture fraud claims in an effort to set aside an extensively negotiated contract because they have developed a case of buyer's remorse. Delaware courts routinely hold such parties to their contractual bargain and reject such claims, and this Court should as well.

Tawa plc, QX Reinsurance Company and PRO IS, Inc. (collectively, "Plaintiffs") entered into a reinsurance transaction that, at the end of the day, almost certainly will result in a loss for them. Rather than accept that they assumed the risk of this loss, Plaintiffs have manufactured claims based on alleged misrepresentations Pennsylvania National Mutual Casualty Insurance Company ("Penn National") purportedly made both within and outside the parties' contract, the Master Transaction Agreement ("MTA"), copy attached as Exhibit A.[1]  There were no misrepresentations here – Penn National was completely forthcoming and honest throughout its dealings with Plaintiffs – and Plaintiffs' strained attempt to lay their poor business judgment at the feet of Penn National should be rejected.

Plaintiffs' claims should be dismissed pursuant to Rules 9(b) and 12(b)(6) because they are barred by the contractual terms the parties agreed to in the MTA.  For example, Plaintiffs assert fraud claims based on misrepresentations Penn National purportedly made outside the four corners of the MTA; yet, the MTA makes clear that the only representations Penn National made and the only representations Plaintiffs relied upon are those set forth in the contract.  These provisions bar fraud claims based on alleged extra-contractual misrepresentations.

Similarly, Plaintiffs' equitable fraud claims are barred by the contractual representations on which they bring suit.  Under Delaware law, knowledge (*i.e.*, Penn National's knowledge that the contractual representations were purportedly false) is not an element of Plaintiffs' equitable

---

[1] For the ease of the Court, the MTA provisions cited below have been extracted from the larger contract and set forth in Exhibit B attached hereto.

fraud claims; yet, the representations in the MTA that Plaintiffs contend are false are "knowledge qualified" and, therefore, cannot be breached unless Penn National actually knew the representations were incorrect.  Because the elements of Plaintiffs' equitable fraud claims are inconsistent with the contractual representations on which Plaintiffs bring suit, Plaintiffs' equitable fraud claims are barred and must be dismissed.[2]

Likewise, Plaintiffs' misrepresentation and breach claims related to Sections 3.8(a), (b) and (c) of the MTA fail because Plaintiffs do not allege that they provided the contractually required claims notice within an eighteen month post-closing window as required by the MTA and, as a result, "all claims for inaccuracy or breach of such representations and warranties . . . [have been] . . . irrevocably waived" pursuant to the express terms of the MTA.

Putting these issues aside, Plaintiffs' claims are still deficient.  In particular, any claim that Penn National engaged in fraud by withholding a single document, referred to below as the Dackman Tenant List, fails because (a) Penn National gave Plaintiffs the Dackman Tenant List prior to closing, (b) the data on the Dackman Tenant List is incomplete, unreliable and immaterial to the losses being reinsured, and (c) Plaintiffs fail to properly allege that Penn National knew that the Dackman Tenant List was material to the losses being reinsured (it was not) and had to be disclosed pursuant to Section 3.8(a) of the MTA (it did not).

## FACTUAL BACKGROUND

Plaintiffs allege that, in October of 2010, Penn National, a mutual insurance company that issued commercial general liability policies to thirty-one landlords in Baltimore between 1991 and 1997, contacted Plaintiffs, as part of a competitive bid process, to see if Plaintiffs would reinsure certain losses under those policies.  The reinsurance was to cover losses arising from lead paint claims asserted against the landlords by minors who purportedly were exposed to

---

[2] Plaintiffs also cannot assert equitable fraud claims because they have not articulated a basis for invoking equitable jurisdiction.

lead paint at a landlord property between 1991 and 1997. (Comp. ¶¶ 4, 8, 10)[3] The thirty-one landlords collectively owned thousands of properties during the coverage period.

Plaintiffs began their due diligence in October 2010. After engaging in months of due diligence, negotiations and drafting, the parties signed the MTA and related agreements on March 31, 2011. (Comp. ¶¶ 12, 13, 55) These contracts require Plaintiffs to provide Penn National with $100 million in reinsurance on losses arising from lead paint claims asserted against the thirty-one Baltimore landlords. In essence, Plaintiffs agreed to pay every dollar Penn National was required to expend on lead paint claims asserted against the thirty-one landlords up to $100 million. Penn National paid $58,975,000 for this reinsurance. (Comp. ¶¶ 29-31)

The MTA required Penn National to compile certain schedules of information. The schedules were collected in a Cedent Disclosure Schedule, excerpts of which are attached as Exhibit C. In pertinent part, the Cedent Disclosure Schedule states that "in accordance with Section 7.6 of the [MTA], the Cedent Disclosure Schedule is deemed to be part of the entire agreement among the parties with respect to the subject matter of the [MTA]" and "[a]ny disclosure made in any part of the Cedent Disclosure Schedule shall be deemed to be disclosed for all purposes of the [MTA] and all other sections of the Cedent Disclosure Schedule to the extent it is reasonably apparent on its face that such disclosure is applicable to such other sections of the Cedent Disclosure Schedule."[4]

---

[3] By 2010, the statute of limitations barred everyone but individuals who were young children in the 1991 to 1997 time frame from bringing new lead paint claims against landlords. This is true because, under Maryland law, a three year statute of limitations applies to lead paint claims, but this statute is tolled until a minor reaches the age of 18. Thus, in 2010, only those individuals who had been exposed to lead at a landlord property in the 1991 to 1997 time period and who were still under the age of 21 could bring a new claim against a Penn National insured landlord. (Comp. ¶ 10)

[4] Although Plaintiffs did not attach the Cedent Disclosure Schedule to their complaint, it can be considered on this motion because it is part of the MTA and the Plaintiffs attached the MTA to their complaint. *See Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1357-58 (D. Del. 1993) ("When deciding a Rule 12(b)(6) motion, the Court may consider the terms of an agreement referenced in the complaint.") (citation omitted). Indeed, Plaintiffs contend that certain schedules made part of the

A.    **Sections 3.8(a), (b) and (c) Of The Master Transaction Agreement**

The representations Penn National made in the MTA are set forth in ARTICLE III of the

contract.  (Comp. ¶ 39)  Plaintiffs contend ARTICLE III, Sections 3.8(a), (b) and (c) of the MTA

contain misrepresentations.

In Section 3.8(a), Penn National represented that "[t]o the Knowledge of Cedent, [Penn

National's] delivery or provision of access to [Plaintiffs] . . . of the Review Data . . . represents

complete disclosure of all data and information material to the losses being reinsured . . . ."  (Ex.

B)  "Knowledge of Cedent" is defined as "the actual knowledge, after reasonable inquiry and

investigation, of" Frank Benedek, Thomas Kline, Sharon Lane, Alan McCormick, Brent

Reifsnyder or Karen Yarrish, all of whom are Penn National employees.  (Comp. ¶ 45)  This is a

"knowledge qualifier" and "has the effect 'of shifting the focus, in a determination of the truth or

falsity of [a] . . . statement, from an inquiry into whether the facts asserted were true *to whether,*

*on the basis of what he knew, the [party making the representation] believed them to be true*.'"[5]

Plaintiffs contend Sections 3.8(a) is inaccurate because the Dackman Tenant List purportedly

contains information material to the losses being reinsured and should have been disclosed as

part of the Review Data.

In Section 3.8(b) of the MTA, which contains the same "Knowledge of Cedent" qualifier,

Penn National represented that Schedule 3.8(b) to the MTA "constitutes a true, correct and

---

Cedent Disclosure Schedule do not contain full and complete information and for this reason alone the
Cedent Disclosure Schedule and its contents can be considered on this motion.  *See Southern Track &
Pump, Inc. v. Terex Corp.*, 722 F. Supp.2d 509, 515 (D. Del. 2010) ("In addition to an exhibit attached to
a complaint, 'a court may consider an indisputably authentic document that a defendant attaches as an
exhibit to a motion to dismiss if the plaintiff's claims are based on the document") (citation omitted).

[5]  *Price Auto. Grp. v. Dannemann*, 2002 WL 31260007, at *4 (Del. Super. Sept. 25, 2002) (emphasis in
original).  *See also DCV Holdings, Inc. v. ConAgra*, 889 A.2d 954, 962 (Del. 2005) (seller knowledge
qualifier "allocate[es] to the Buyer the risk of any unknown and undisclosed liabilities"); Kling, Simon &
Goldman, *Summary of Acquisition Agreements*, 51 U. Miami L. Rev. 779, 792-93 (1997) ("If the
representation is qualified by a knowledge limitation, the buyer, in order to recover damages, not only has
to show that the underlying representation was false, but also that the seller knew it to be so.")

complete listing of all claims" made under the general liability contracts issued to the thirty-one landlords. (Ex. B) Plaintiffs contend Section 3.8(b) is incorrect because Schedule 3.8(b) does not list all claims made under the policies issued to the landlords.

In Section 3.8(c) of the MTA, which is also knowledge qualified, Penn National represented that the claims files Penn National made available to Plaintiffs were true and correct, reflected all material claims data and constituted all of the files relating to the administration of claims as of the date they were provided. (Ex. B) Plaintiffs contend that the claims files were not completed or accurate as of the date provided and, as a result, Section 3.8(c) is inaccurate.

**B.      Sections 6.3 And 6.4 Of The Master Transaction Agreement**

In Sections 6.4(c) and 6.3(a) of the MTA, the parties agreed to limit how long the representations in Sections 3.8(a), (b) and (c) remain in effect and to bar claims for fraud and breach of contract based on these representations unless Plaintiffs provided Penn National with a claims notice identifying the provisions of the MTA which purportedly are inaccurate within eighteen months of closing (*i.e.*, on or before September 31, 2012). (Ex. B) Plaintiffs' complaint is silent as to whether or not they submitted a claims notice to Penn National prior to filing their complaint on August 15, 2013.

**C.      The No Extra-Contractual Representations, Anti-Reliance and Liability Disclaimer Provisions of the MTA**

The MTA, like most sophisticated purchase agreements, contained standard provisions defining and limiting the scope of the representations Penn National made in connection with the transaction. Specifically, in Sections 3.14(a), 4.12 and 4.13 of the MTA, the parties agreed that the only representations Penn National made to Plaintiffs are those set in ARTICLE III of the MTA. (Ex. B) Similarly, in Section 3.14(b), the parties agreed that the only representations Plaintiffs relied upon when entering the MTA were those set forth in ARTICLE III of the MTA. (Ex. B) Finally, in Sections 4.12 and

6.5, the parties agreed that Plaintiffs waived and disclaimed any claim except for claims premised on contractual fraud and indemnity pursuant to ARTICLE VI.  (Ex. B)[6]

D.      **Other Contractual Provisions**

In Section 4.12, Plaintiffs represented that they are sophisticated parties who made their own decision about whether to enter the MTA.  (Ex. B)

In Section 7.7, the parties agreed that the MTA would be governed by and construed in accordance with Delaware law, without regard to principles of conflict or choice of law.  In Section 7.12, the parties waived the right to a jury trial in any lawsuit related to the MTA.

E.      **The Dackman Tenant List**

One of the Baltimore landlords insured by Penn National from 1991 to 1997 was Elliot Dackman.  Over the years, Mr. Dackman had retained numerous applications submitted by potential renters.  These applications, which had been submitted over a period extending from the 1960s to 2009, identified (i) individuals who had submitted an application to rent one of his properties and, (ii) in some instances, also included the names and birth dates of children who would live with the applicant if the applicant became a tenant.  In December 2010, Penn National retained a law firm to collect information from the rental applications and the law firm created a spreadsheet it labeled "Dackman Tenant List" (even though it was a list of names of applicants) that it delivered to Penn National.  (Comp. ¶¶ 56-58).[7]

Plaintiffs allege that the Dackman Tenant List (the "DTL") was "material to the losses being reinsured" and should have been disclosed pursuant to Section 3.8(a) of the MTA because, it purportedly would have allowed them to "calculat[e] the universe of potential plaintiffs" or

---

[6]  ARTICLE VI of the MTA addresses the parties' post-closing indemnification rights for breaches of the MTA and its provisions state that indemnity, which is capped at $8 million, would be the exclusive remedy for breach except for claims of fraud.

[7]  The Dackman Tenant List is lengthy and is not attached in an effort to avoid over-burdening the Court. If the Court would like a copy for purposes of addressing this motion, Penn National will provide a chambers copy upon request.

"develop a much more reliable reserve estimate of future claims." (Comp. ¶¶ 70, 86)  Plaintiffs do not explain how the DTL would have allowed them to take these steps, an unsurprising result given that the DTL is incomplete, unreliable and immaterial to the losses being reinsured.

The DTL contains the following data to the extent it could be obtained from Mr. Dackman's files: (a) addresses of some properties owned by Mr. Dackman, one of the thirty-one landlords; (b) the names of applicants and co-applicants who submitted a rental application to Mr. Dackman; (c) the applicant/co-applicant's date of birth; (d) the date the application was submitted; (e) the names of additional occupants (*e.g.*, children) who would reside with the applicants if they became tenants; and (f) the date of birth/age of the additional occupants on the date the application was submitted.  This data, the overwhelming majority of which does not relate to the 1991 to 1997 time period covered by the MTA, does not identify the children who were exposed to lead paint at one of Mr. Dackman's properties (*i.e.*, "the universe of potential claimants" who might bring a claim against Mr. Dackman).  (Comp. ¶ 70)

To the contrary, as Plaintiffs allege, at most the DTL "reflected . . . the number of and ages of the children who *may have* resided in the units [owned by Mr. Dackman] over the relevant period."  (Comp. ¶ 61 (emphasis added)).  This is not the only limitation of the DTL:

- The DTL relates only to Mr. Dackman, and not to any of the thirty other landlords;

- The DTL does not reflect whether lead paint chips or lead paint dust even existed at the property listed;

- No one knows if the rental applications maintained by Mr. Dackman are complete (*i.e.*, whether Mr. Dackman has all the rental applications for all his applicants);

- No one knows which of the children listed on the DTL ever resided at (or even visited) properties owned by Mr. Dackman and/or which of the children who did reside at or visit a Dackman property were exposed to lead paint;

- The DTL does not identify extended family members or friends who moved into the insured property after the application was submitted; and

- The rental applications do not reflect the names or ages of children who visited or were cared for by tenants of Mr. Dackman's properties.

Furthermore, the DTL does not identify children born to applicants who became tenants after the rental application was completed. In 2010, these children, who had not yet turned 21 and whose claims had not yet been barred by the running of the statute of limitations, likely constituted a large portion of the plaintiffs who could bring a non-time barred claim against Mr. Dackman; yet none of them are identified on the DTL.

Plaintiffs allege that Karen Yarrish, Penn National's general counsel, was aware of the DTL. (Comp. ¶¶ 60, 64, 66, 88, 157, 169, 181, 195)[8] The complaint contains no allegations as to whether or how Ms. Yarrish knew that the DTL was "material to the losses being reinsured" (it was not) such that the representation in Section 3.8(a) of the MTA was inaccurate.

On March 28, 2011, prior to the closing on the MTA, Penn National sent Plaintiffs 6 CDs of information related to the lead paint business, including the DTL. (Comp. ¶ 64) The cover letter sent with the disks stated: "the following materials are enclosed... 3. Miscellaneous Claims information (policy lists with aggregates, insured property locations, Dackman tenant list . . .)."

## F.    Plaintiffs' Claims Notice

As set forth above, Sections 6.4(c) and 6.3(a) of the MTA provide that Penn National's contractual representations in ARTICLE III remain in effect for only eighteen months post-closing and are waived unless Plaintiffs send Penn National a timely claims notice identifying the purportedly inaccurate representations in the MTA. Plaintiffs' complaint makes no mention of Plaintiffs having submitted a claims notice to Penn National.

While the complaint does not mention it, Plaintiffs did submit a claims notice to Penn National on September 28, 2012, three days before the eighteen month post-closing survival

---

[8] The complaint does not contend that Frank Benedek, Thomas Kline, Sharon Lane, Alan McCormick, or Brent Reifsnyder, the other Penn National employees within the definition of Knowledge of Cedent, were aware of the DTL.

period expired ("Claims Notice"). The Claims Notice stated that Plaintiffs' "Claim is fully described in the enclosed Draft Complaint" and that "The Draft Complaint describes the Claim in reasonable detail, indicates the amount of the Loss, the method of computation thereof, and the provisions of the Agreement under which [Plaintiffs'] right of indemnification arise." The Draft Complaint identified claims under Section 3.8(a) and Section 3.8(b) of the MTA, but *did not* give notice of a claim under (and made no reference to) Section 3.8(c).

### G.   Plaintiffs' Complaint

Plaintiffs' complaint contains ten counts. The claims asserted in each count are summarized in Exhibit D attached hereto. With respect to Counts I-VI, Plaintiffs seek to rescind the MTA, restore the parties to their "pre-contractual position by returning the reinsurance premium Penn National paid less the amounts expended by QX on claims" and extinguish Plaintiffs' obligations under the MTA and related agreements. (Comp. ¶¶ 94-95, 106-107, 118-119, 130-131, 142-143, 153-154, prayer for relief). With respect to Counts VII-X, Plaintiffs seek compensatory damages. (Comp. ¶¶ 163-165, 175-177, 191-192, 203, prayer for relief).

ARGUMENT

## I.   THE APPLICABLE STANDARD OF REVIEW

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Aschcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court changed the Rule 12(b)(6) landscape. Specifically, the Supreme Court directed federal courts to retire the old *Conley v. Gibson*, 355 U.S. 41 (1957), "no set of facts" standard.[9] In its place, the Supreme Court instructed district courts to employ a "two-pronged approach" for determining whether a complaint survives a Rule 12(b)(6) motion. First, a district court should identify those factual allegations that are nothing more than "legal

---

[9] *Twombly*, 550 U.S. at 555.

9

conclusions" or "naked assertions."[10] Such allegations are "not entitled to the assumption of truth" and must be disregarded.[11] Second, a district court must then assess "the 'nub' of the plaintiff['s] complaint – the well pleaded, nonconclusory factual allegation[s]" – to determine whether it states a plausible claim for relief.[12] Importantly, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief,''" and fails to state a claim.[13]

Under Rule 9(b), allegations of fraud must be pled with particularity. When fraud by omission is alleged, a court must analyze the alleged omission to determine whether plaintiff pleaded, with requisite particularity, that the omission was material.[14] When alleged omissions "are so obviously unimportant . . . courts can rule them immaterial at the pleading stage."[15]

## II.    APPLICABLE DELAWARE LAW

Under Delaware law, a fraud claim can be based on factual statements made within a contract (*e.g.*, representations and warranties) as well as factual statements made outside a contract (*e.g.*, during the negotiation period leading to the signing of a contract);[16] however, Delaware law also allows parties to contractually agree to waive/bar claims of fraud based on statements made outside a contract.[17] Statements made outside a contract often are referred to as "extra-contractual" and, under Delaware law, such statements cannot form the basis of a fraud

---

[10] *Twombly,* 550 U.S. at 555, 557.

[11] *Iqbal*, 556 U.S. at 679.

[12] *Iqbal*, 556 U.S. at 679.

[13] *Id.* at 678.

[14] *Rockefeller Center Properties, Inc. Securities Litig.*, 311 F.3d 198, 211, 216 (3d Cir. 2002).

[15] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[16] *Phoenix Equity Grp. LLC v. BPG Justison P2 LLC*, 2010 WL 1223619, at *1 (Del. Ch. Mar. 25, 2010) (citing *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1040-45 (Del. Ch. 2006)).

[17] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 140 (Del. Ch. 2009) (citing *Abry Partners*, 891 A.2d at 1057; *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).

claim when the parties' contract states that (i) the only representations being made are set forth in the contract, (ii) the parties are not relying on any representations other than those set forth in the contract, and (iii) the parties disclaim liability for losses arising under the contract except for instances of contractual misrepresentation.[18]   Such provisions allow a plaintiff to pursue a contractual misrepresentation claim;[19] however, they preclude a plaintiff from pursuing a fraud claim based on extra-contractual statements.[20]

Under Delaware law, fraud can be pursued under either a common law fraud theory or, in certain limited circumstances, under an equitable fraud theory.  The elements of common law fraud are: "'(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.'"[21]   For equitable fraud, however, "'there is no requirement that the defendant have known or believed its statement to be false . . . .'"  *Id.*  "Thus, to state a case for equitable fraud, a plaintiff must satisfy all the elements of common-law fraud with the exception that the plaintiff need not demonstrate that the misstatement or omission was made knowingly . . . ."  *Id.*

---

[18] *See, e.g.*, *Kronenberg*, 872 A.2d at 593 (extra-contractual fraud claims are barred when the parties' contract contains "a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."); *Progressive Internat'l Corp. v. E.I. du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002) ("Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations.").

[19] *Abry Partners*, 891 A.2d at 1036, 1064.

[20] *Progressive*, 2002 WL 1558382, at *1-2.

[21] *Ameristar Casinos, Inc. v. Resorts Int'l Holdings, LLC*, 2010 WL 1875631, at *10 (Del. Ch. May 11, 2010) (citation omitted).

## III.   PLAINTIFFS' EXTRA-CONTRACTUAL FRAUD CLAIMS FAIL

Plaintiffs contend that Penn National made extra-contractual misrepresentations and failed to disclose the DTL during the due diligence period.  (Comp. ¶¶ 24-27, 61, 69)  To the extent Counts I-X are based on alleged misrepresentations outside the MTA, these claims fail.

Any extra-contractual fraud claims are barred by the standard no extra-contractual representations, anti-reliance and liability disclaimer provisions that the parties agreed to include in the MTA.  These provisions state that (a) the only representations Penn National made in connection with the transaction were the representations set forth in ARTICLE III of the MTA, (b) the only representations Plaintiffs relied upon were those set forth in ARTICLE III of the MTA, and (c) Penn National shall not have any liability to Plaintiffs for statements or omissions except for misrepresentations in ARTICLE III of the MTA.  (Ex. B, §§ 3.14(a), 3.14(b), 4.12, 4.13, 6.5)  As a result of these provisions, Plaintiffs are barred from asserting any extra-contractual fraud claim.[22]

Any extra-contractual fraud claim premised on the alleged failure to disclose the DTL also fails because the DTL was disclosed to Plaintiffs prior to the closing.  (Comp. ¶ 64)[23]

---

[22] *Phoenix Equity Grp.*, 2010 WL 1223619, at *1-2 (plaintiff's extra-contractual fraud claim was "doomed by an anti-reliance provision" in the contract because "as a matter of Delaware law, [Plaintiff] may not claim to have relied on extra-contractual statements after contractually representing that it was not doing so"); *Progressive*, 2002 WL 1558382, at *7 ("Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations"); *DCV Holdings, Inc. v. Conagra, Inc.*, 2002 WL 508343, at *5-6 (Del. Super. Apr. 1, 2002) (anti-reliance and liability disclaimer provisions "barred [plaintiff] from pursuing its fraud claims based on . . . oral statements" made outside the contract during due diligence); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 552 and 556 (Del. Ch. 2001) (where parties agreed that "[n]one of [the sellers] make any express or implied representation or warranty as to the accuracy or completeness of the information contained herein" and "[e]ach of [the Sellers] expressly disclaim[ed] any and all liability that may be based on such information or errors therein or omissions therefrom," the court dismissed plaintiff's fraud by omission claims "[b]ecause the parties' contractually agreed-to disclaimers extinguish[ed] the fraud claims being asserted").

[23] *DCV Holdings*, 2002 WL 508343, at *7 (fraud claim dismissed when defendant provided allegedly withheld information to plaintiff prior to contract signing).

## IV.   PLAINTIFFS' EQUITABLE FRAUD CLAIMS FAIL

### A.   The Knowledge Qualifier Bars Plaintiffs' Equitable Fraud Claims

As demonstrated above, any fraud claim Plaintiffs assert must be premised on a purportedly false representation in the MTA.  Here, Plaintiffs contend that Sections 3.8(a), (b) and (c) of the MTA contain false statements.  The representations in each of these sections is a qualified representation, as opposed to an absolute representation, in that each representation is made "to the Knowledge of Cedent," a term defined as the "actual knowledge" of six Penn National employees.

The "Knowledge of Cedent" knowledge qualifier fundamentally changes Plaintiffs' contractual misrepresentation claims.  Specifically, to prove that Sections 3.8(a), (b) or (c) contain false representations, Plaintiffs "not only ha[ve] to show that [one of] the underlying representation[s] [in Sections 3.8(a), (b) or (c)] w[ere] false, but also that [one of the six Penn National employees listed in the Knowledge of Cedent definition actually] knew it to be so."[24]

The "Knowledge of Cedent" knowledge qualifier renders Plaintiffs' equitable fraud claims inconsistent with the contractual representations on which Plaintiffs have brought suit.  Specifically, Plaintiffs' equitable fraud claims do not require Plaintiffs to demonstrate that Penn National knew that the representations in Section 3.8(a), (b) and (c) were false; yet, because the representations in Sections 3.8(a), (b) and (c) are qualified by the "Knowledge of Cedent" knowledge qualifier, in order for Plaintiffs to succeed on a claim under these sections, Plaintiffs must show that one of six Penn National employees had actual knowledge that a representation

---

[24] *Summary of Acquisition Agreements*, 51 U. Miami L. Rev. at 792-93 ("If the representation is qualified by a knowledge limitation, the buyer, in order to recover damages, not only has to show that the underlying representation was false, but also that the seller knew it to be so.")  *See also Price Auto.*, 2002 WL 31260007, at *4-5 (holding that knowledge qualifier "has the effect 'of shifting the focus, in a determination of the truth or falsity of [a] . . . statement, from an inquiry into whether the facts asserted were true *to whether, on the basis of what he knew, the applicant believed them to be true*'" and this is a "'subjective test'" which evaluates what the person making the representation knew)  (emphasis in original, citation omitted).

13

in one of the sections was false.  The inconsistency between Plaintiffs' equitable fraud theory –
which requires no showing of Penn National's knowledge – and Plaintiffs' specific contractual
misrepresentation claims – all of which require proof of Penn National's knowledge - bars the
equitable fraud claims Plaintiffs assert in Counts IV through VI.[25]

    This result is not surprising.  "Delaware law permits sophisticated commercial parties to
craft contracts that insulate a seller from a rescission claim for a contractual false statement of
fact that was not intentionally made.  In other words, parties may allocate the risk of factual error
freely as to any error where the speaking party did not consciously convey an untruth . . . ."[26]
Moreover, the "Knowledge of Cedent" qualifier is a term that sophisticated parties agreed upon
when negotiating the terms of a complex transaction.  "Under Delaware law, which is more
contractarian than that of many other states, parties' contractual choices" - such as how to define
Knowledge of Cedent and which representations it qualifies - "are respected"[27] and cannot be
ignored absent proof of "a public policy interest even stronger than freedom of contract."[28]

### B.    Plaintiffs' Equitable Fraud Claims Fail Because Plaintiffs Have Not Invoked Equity's Special Jurisdiction

    Even if the terms of the MTA did not bar Plaintiffs' equitable fraud claims, such claims
still must be dismissed because Plaintiffs have not met a threshold requirement for asserting an

---

[25] *Metro Commc'n Corp. BVI v. Advanced Mobilcomm Tech., Inc.*, 854 A.2d 121, 155-163 n. 101 (Del.
Ch. 2004) (dismissing equitable fraud claims against corporate fiduciaries because absence of knowledge
requirement in equitable fraud claim is inconsistent with standard governing fiduciary conduct, which
required a showing of "knowingly disseminating false information": if stockholders "cannot bring a
fiduciary duty [of disclosure] claim . . . because the directors did not deliberately mislead the
stockholders" as required by Delaware law governing fiduciaries, then "why should [the stockholders] be
permitted to bring an equitable fraud claim").

[26] *Abry Partners*, 891 A.2d at 1035-36.

[27] *GRT, Inc. v. Marathon GTF Tech. Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011).

[28] *Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch. 2005) ("When parties have ordered their affairs
voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement and
will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public
policy interest even stronger than freedom of contract.")

equitable fraud claim:  invoking equity's special jurisdiction.

A claim for "equitable fraud . . . is not available in every case or to every plaintiff . . . ."[29]
To the contrary, "[e]quitable fraud can only be applied in those cases in which one of the two
fundamental sources of equity jurisdiction exist: (1) an equitable right founded upon a special
relationship over which equity takes jurisdiction, or (2) where equity affords its special remedies,
e.g., rescission, or cancellation; where it is sought to reform a contract . . . or to have a
constructive trust decreed."[30]  Neither source of equitable jurisdiction exists here.

There is no special (*i.e.*, fiduciary) relationship here.  Plaintiffs allege no special
relationship and their claims are based on a contract that was negotiated by sophisticated parties
at arms' length.  Such claims do not give rise to equity jurisdiction.[31]

As to a special equitable remedy, Plaintiffs seek rescission, but there is a distinction
between equitable and legal rescission and Plaintiffs have not pled grounds for equitable
rescission.[32]  In their complaint, all Plaintiffs seek is to return to the status quo that existed prior
to the signing of the MTA and damages attendant thereto.  (Comp. ¶¶ 94-95, 106-107, 118-119,
130-131, 142-143, 153-154, 163-165, 175-177, 191-192, 203, prayer for relief).  Relief of this
nature can be awarded at law, and a request for it does not give rise to equitable jurisdiction.

The case of *Northpointe Holdings, Inc. v. Nationwide Emerging Managers, LLC*, 2010
WL 3707677 (Del. Super. Sept. 14, 2010) is instructive.  There, the plaintiff filed its case in
Superior Court, Delaware's court of law, not the Court of Chancery and asserted, among other
things, a claim for equitable fraud and a request for rescission of a purchase agreement.  When

---

[29] *Perlmutter v. Salton, Inc.*, 2010 WL 3834040, at *5 (D. Del. Sept. 24, 2010).

[30] *Kolber v. Body Central Corp.*, 2012 WL 3095324, at *5 (D. Del. July 30, 2012).

[31] *Perlmutter*, 2010 WL 3834040, at *5 (contractual relationship does not create special relationship between parties sufficient to assert equitable fraud claim); *Ameristar*, 2010 WL 1875631, at *10 (same).

[32] *E.I. du Pont de Nemours v. HEM Research, Inc.*, 1989 WL 122053, at *3 (Del. Ch. Oct. 13, 1989) ("It is perhaps not commonly appreciated that rescission is a remedy awarded by law courts.").

defendants moved to dismiss for lack of subject matter jurisdiction over the equitable fraud claim, plaintiff did not oppose and asked that the case be moved to Chancery Court (which has exclusive subject matter jurisdiction over equitable fraud claims).  The Superior Court denied this request finding that "no special relationship exists between the parties" and that plaintiff had only alleged a "claim for legal rescission."  *Id.* at *8-9.  With respect to legal versus equitable rescission, the Court stated that all plaintiff sought was a return to the status quo and, as a result, it had an adequate remedy at law in the form of legal rescission.  Because an equitable remedy was not necessary, the case was not transferred to Chancery Court and the claim for equitable fraud was dismissed.  *Id.*

Similarly, in *Prestancia Management Group, Inc. v. Virginia Heritage Foundation, II LLC*, 2005 WL 1364616 (Del. Ch. May 27, 2005), the plaintiff sought rescission of the contract it entered with the defendants as well as the return of the $500,000 plaintiff invested at the time the agreement was signed.  The Court noted the difference between legal and equitable rescission, and then held that a court of law could grant plaintiff the relief it was seeking and, therefore, the Court of Chancery lacked subject matter jurisdiction.  *Id.* at *5.

## V.  PLAINTIFFS' CONTRACTUAL MISREPRESENTATION AND BREACH OF CONTRACT CLAIMS FAIL

### A.  Plaintiffs' Failure To Allege They Submitted A Claims Notice Bars Their Contractual Misrepresentation and Breach of Contract Claims

On the face of the complaint, Plaintiffs' Section 3.8(a), (b) and (c) contractual mis-representation and breach of contract claims are time barred.  Sections 6.4(c) and 6.3(a) of the MTA (i) require Plaintiffs to provide Penn National with a claims notice raising mis-representation and breach claims within eighteen months of closing, and (ii) state that the failure to provide such notice results in the waiver of any claim for misrepresentation or breach.  Plaintiffs' complaint does not allege that Plaintiffs submitted a claims notice within the eighteen

month period and the complaint was filed more than eighteen months after the March 31, 2011

closing. As a result, on the face of the complaint, all of Plaintiffs' claims for contractual

misrepresentation and breach under Sections 3.8(a), (b) and (c) should be dismissed.[33]

It is not clear why Plaintiffs did not attach or refer to their Claims Notice in their

complaint, but it appears to be an effort to avoid dismissal of their Section 3.8(c) claims.

Plaintiffs' Claims Notice refers to Sections 3.8(a) and (b) of the MTA, but makes no mention of

Section 3.8(c). This fact -- and Section 6.4(c) of the MTA which states that "all representations .

. . shall survive the Closing for a period of eighteen months . . . whereupon they shall expire and

all claims for inaccuracy or breach of such representations . . . will be deemed irrevocably

waived unless notice of the inaccuracy or breach thereof shall have been given . . ." before the

eighteen month period expires -- bars Plaintiffs' Section 3.8(c) claims. Indeed, even if Plaintiffs

amend their complaint and refer to their Claims Notice, their Section 3.8(c) claims should still be

dismissed as time barred.[34]

## B.    Plaintiffs' Section 3.8(a) Claims Fail

Plaintiffs' Section 3.8(a) misrepresentation and breach of contract claims also must be

dismissed because Plaintiffs have failed to plead particularized, non-conclusory facts which state

a plausible claim for fraud or breach under Section 3.8(a) of the MTA.

---

[33] *Harper v. Del. Valley Broadcasters*, 743 F. Supp. 1076 (D. Del. 1990), *aff'd,* 932 F.2d 959 (3d Cir. 1991) (contract barred plaintiff from asserting claim without first providing notice as required by the terms of agreement); *Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 6840625, at * 13 (Del. Super. Dec. 7, 2012) ("contractual notice . . . provisions cannot be ignored"); *GRT*, 2011 WL 2682898, at *15 (dismissing claims for contractual misrepresentation filed outside the representation survival period and stating that "a survival clause . . . that expressly states that the covered representations and warranties will survive for a discrete period of time, but will thereafter 'terminate,' makes plain the contracting parties' intent that the non-representing and warranting party will have a period of time, *i.e.*, the survival period, to file a claim for a breach of the surviving representations and warranties, but will thereafter, when the surviving representations and warranties terminate, be precluded from filing such a claim.").

[34] *GRT*, 2011 WL 2682898, at *15.

In Section 3.8(a), Penn National represented that "To the Knowledge of Cedent, [Penn National's] delivery or provision of access to [Plaintiffs] . . . of the Review Data . . . represents complete disclosure of all data and information material to the losses being reinsured . . . ." In order for Plaintiffs to pursue a claim based on this contractual language and the alleged non-disclosure of the DTL (which was disclosed prior to closing), Plaintiffs must allege particularized, non-conclusory facts which state a plausible claim that the DTL contains information material to the losses being reinsured and that one of six Penn National employees knew the DTL contained such information.[35]  Plaintiffs' complaint does not meet this standard.

With regard to the DTL, Plaintiffs repeatedly conclude that the DTL is material, that its materiality "is beyond cavil" and that disclosure of it would have permitted them to more accurately "calculat[e] the universe of potential plaintiffs" or "develop a much more reliable reserve estimate of future claims."  (Comp. ¶¶ 59, 61, 66, 67, 70, 86, 122, 157, 169, 181,195) Yet, there are no facts in the complaint (let alone particularized facts) to support these conclusions and "mere conclusions" such as these "are not entitled to the assumption of truth" on a motion to dismiss.[36]  Under *Twombly*, *Iqbal* and Rule 9(b), a plaintiff must plead more than mere labels.  A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"[37] and more particularized facts to plead fraud. Plaintiffs have not met their pleading burden with respect to the materiality of the DTL.

Plaintiffs' inability to allege facts supporting materiality is not surprising because, as demonstrated above, the DTL is incomplete (*e.g.*, it relates to just one of thirty-one landlords, it does not include children who were born after the rental application was submitted or who

---

[35] *See Iqbal*, 556 U.S. at 678 and 682-83 (holding that, to state a claim, plaintiffs must assert non-conclusory facts which give rise to a plausible claim for relief and that the plausibility standard "asks for more than a sheer possibility that a defendant" has acted improperly); Rule 9(b).

[36] *Iqbal*, 556 U.S. at 679.

[37] *Id.* at 678 (quoting *Twombly*, 550 U.S. 544).

visited or temporarily resided at the properties and might have been exposed, etc.) and it is unreliable (*e.g.*, it reflects children who "may have" resided in one of Mr. Dackman's units, it is not clear if the source documents, the rental applications, are complete, it is not clear which, if any, of the properties listed contained lead paint chips or dust, etc.). Given the incomplete and unreliable nature of the data on the DTL, Plaintiffs cannot plead particularized facts which support a plausible claim that the DTL is material to the losses being reinsured.

Plaintiffs' complaint likewise contains no facts (particularized or otherwise) plausibly claiming that, consistent with the Knowledge of Cedent qualifier, one of six Penn National employees had actual knowledge that the DTL was material to the losses being reinsured. While such knowledge is an element of Plaintiffs' Section 3.8(a) claims, all Plaintiffs allege is that Ms. Yarrish was aware of the DTL and that the DTL was not disclosed to Plaintiffs (even though it was). (Comp. ¶¶ 60, 64, 66, 88, 157, 169, 181, 195) Such allegations do not satisfy the pleading requirement of Rule 12(b)(6) or Rule 9(b) and are not sufficient to state a claim.[38]

### C.   Plaintiffs' Section 3.8(b) Claims Fail

Plaintiffs' Section 3.8(b) misrepresentation and breach of contract claims also must be dismissed because Plaintiffs have failed to plead particularized, non-conclusory facts which state a plausible claim under Section 3.8(b) of the MTA.

Plaintiffs contend that the representation in Section 3.8(b) is inaccurate because Schedule 3.8(b) does not contain a complete list of the underlying claims that had been asserted against

---

[38] *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny. Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." (internal quotations and citations omitted)); *Metro Commc'n*, 854 A.2d at 147 (when a fraud by concealment claim is asserted that "has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it" (internal quotations and citation omitted)).

landlords; yet, nowhere do Plaintiffs contend that the claims supposedly missing from Schedule 3.8(b) were not disclosed on one of the other schedules to the Cedent Disclosure Schedule. Plaintiffs do not allege this because they cannot.  The overwhelming majority of claims Plaintiffs contend were left off Schedule 3.8(b) were listed on Schedule 3.8(a).[39]  Because the parties agreed that "[a]ny disclosure made in any part of the Cedent Disclosure Schedule shall be deemed to be disclosed for all purposes of the [MTA]" and that information disclosed on one schedule to the Cedent Disclosure Schedule is disclosed for purposes of all schedules to the MTA (*see* Ex. C), and because Plaintiffs have not (and cannot) allege facts suggesting that other schedules to the MTA fail to disclose the information they believe should have been on Schedule 3.8(b), Plaintiffs' claims for misrepresentation/breach of Section 3.8(b) fail to state a claim.

Plaintiffs' Section 3.8(b) misrepresentation claims also fail under Rule 9(b) based on Plaintiffs' failure to identify the claims allegedly omitted from Schedule 3.8(b).  Plaintiffs contend that the representation in Section 3.8(b) is inaccurate because Penn National omitted claims filed against landlords from Schedule 3.8(b), but Plaintiffs fail to identify/particularize the allegedly omitted claims and, as a result, have not complied with Rule 9(b).[40]

## CONCLUSION

For all the foregoing reasons, defendant Penn National respectfully requests that the Court dismiss all claims asserted in Plaintiffs' complaint.

---

[39] The complaint does not identify the claims Plaintiffs contend were left off Schedule 3.8(b); however, Plaintiffs have provided Penn National with a list of such claims.  Plaintiffs' list identifies 261 different claims they contend should have been listed on Schedule 3.8(b).  A review of Schedule 3.8(a) reveals that 250 of the 261 claims allegedly left off Schedule 3.8(b) were listed on Schedule 3.8(a).  (Ex. C)

[40] *See Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 119 (E.D.N.Y. 2011) (when fraud claim "is premised on concealment . . . the complaint must still allege . . . what the omissions were" to satisfy Rule 9(b)).

DRINKER BIDDLE & REATH LLC

By: */s/ Todd C. Schiltz*
    Todd C. Schiltz (I.D. No. 3253)
    Lindsay O. Clizbe (I.D. No. 5321)
    1100 N. Market Street
    Suite 1000
    Wilmington, DE  19801-1254
    Telephone:  (302) 467-4225
    Facsimile:  (302) 467-4201
    todd.schiltz@dbr.com
    lindsay.clizbe@dbr.com

    *Counsel to Defendant*
Dated: September 18, 2013    *Penn National Mutual Casualty Insurance*
    *Company*

## CERTIFICATE OF SERVICE

I, Todd C. Schiltz, hereby certify that on this 18th day of September, 2013, I caused to be served a copy of the within document by CM/ECF Electronic System and by hand delivery, to the following:

> Collins J. Seitz, Jr.
> David E. Ross
> Seitz Ross Aronstam & Moritz LLP
> 100 S. West Street, Suite 400
> Wilmington, DE 19801
> (302) 576-1600
> cseitz@seitzross.com
> dross@seitzross.com

/s/ Todd C. Schiltz
Todd C. Schiltz (DE Bar No. 3253)